UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

RICARDO JIMENEZ,                                    Docket No. 23-cv-06751 (NRB)

                              Plaintiff,            **AMENDED COMPLAINT**

             -against-                              PLAINTIFF DEMANDS TRIAL
                                                    BY JURY

CITY OF NEW YORK, WENDELL STRADFORD,
MICHAEL SERRANO, CHRISTOPHER HORN,
and BRONX COUNTY DISTRICT ATTORNEY'S
OFFICE,

                              Defendants.
------------------------------------------------------------------X

        Plaintiff RICARDO JIMENEZ, by his attorneys, KELNER & KELNER, ESQS.,

as and for his Complaint in the above-captioned action, hereby alleges as follows, upon

information and belief:

## **Preliminary Statement**

        1.      RICARDO JIMENEZ was wrongfully convicted of murder, in violation of his

constitutional rights.  He spent nearly seventeen years behind bars before his petition for a writ

of habeas corpus was granted and he was freed.

        2.      In 1989, Sean Worrell was shot and killed after an altercation in a movie theater.

Bystanders gave largely consistent descriptions of the shooter to the police as a Black man who

spoke with a Jamaican accent and had distinctive blond streaks died into his hair.

        3.      This description bore no resemblance whatsoever to JIMENEZ.  But after a

bizarre encounter with the police, a teenager who was in the movie theater named Esco Blaylock

abandoned his original description of the shooter and agreed to implicate JIMENEZ.  Blaylock

recanted shortly thereafter.

4.      In or around 2000, a detective with the Cold Case Squad, Wendell Stradford, picked up the case.  He improperly induced and/or coerced Blaylock to agree to participate in a case against JIMENEZ.  Stradford also began to communicate with a man named Andrew O'Brien.  O'Brien was serving a 30-year sentence in federal prison and had been writing letters to the judge in his case seeking to reduce his jail time.  O'Brien described himself in one of these letters as a "desperate man."  He already had received one sentence reduction for cooperating with prosecutors.  O'Brien, with the understanding that he would receive assistance from the New York City Police Department and Bronx County DA's office in obtaining a further sentencing reduction, agreed to inculpate JIMENEZ, even though he had no genuine knowledge whatsoever about the shooting.  JIMENEZ was arrested.

5.      After JIMENEZ was arrested, the prosecution added a third witness to its roster, Kevin Morrissey, who claimed JIMENEZ confessed to him while in jail.  Morrissey was an experienced jailhouse informant with a lengthy rap sheet and a history of mental illness; he previously had written a letter to a judge in which he reported that another man was living inside his body and causing him to commit crimes.  Despite his rank incredibility, the Bronx County DA's office chose to use him, too.

6.      JIMENEZ' ensuing trial was infected with unfairness.  The prosecutor, Lisa Mattaway, withheld exculpatory evidence, including materials demonstrating O'Brien's expectation of receiving a reduction of his federal prison sentence in return for his testimony.  Mattaway's disregard of her *Brady* obligations was a product of the culture that was then allowed to exist in the Bronx County District Attorney's Office, in which prosecutors routinely violated their discovery and trial obligations in pursuit of convictions.

7.     After five days of deliberations, a jury convicted JIMENEZ of Murder in the Second Degree.  He remained incarcerated until November of 2022, when his petition for a writ of habeas corpus was granted and he was freed.  The indictment was subsequently dismissed by the Supreme Court, Bronx County, on the People's motion.

8.     This lawsuit seeks compensation for the nearly two decades of his life he lost to unjust incarceration and the other and further damages he has suffered in the past and will continue to suffer in the future.

**Background and Venue**

9.     Plaintiff RICARDO JIMENEZ (hereinafter "plaintiff" or "JIMENEZ") is a resident of the County of Rensselaer, State of New York.

10.    At all times herein mentioned, defendant CITY OF NEW YORK was and remains a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

11.    At all times herein mentioned, defendant WENDELL STRADFORD (hereinafter "STRADFORD") was employed by the CITY OF NEW YORK, by and through its Police Department, and was acting under color of state law.

12.    At all times herein mentioned, defendant MICHAEL SERRANO (hereinafter "SERRANO") was employed by the CITY OF NEW YORK, by and through its Police Department, and was acting under color of state law.

13.    At all times herein mentioned, defendant CHRISTOPHER HORN (hereinafter "HORN") was employed by the CITY OF NEW YORK, by and through its Police Department, and was acting under color of state law.

14.     At all times herein mentioned, the New York City Police Department (hereinafter "NYPD") was and remains an agency of the CITY OF NEW YORK.

15.     At all times herein mentioned, the Bronx County District Attorney's Office (hereinafter "BCDAO") was and remains an agency of the CITY OF NEW YORK.

16.     At all times herein mentioned, the CITY OF NEW YORK was responsible for the management, operation, and control of the BCDAO, including, but not limited to, the selection, training, supervision, discipline, and termination of prosecutors.

17.     The Bronx County District Attorney is an elected officer of Bronx County.  The elected District Attorney is in charge of the BCDAO, which is an agency funded by and through the CITY OF NEW YORK's budget.  The current Bronx County District Attorney is Darcel Clark.  The Bronx County District Attorney at the time of the events alleged herein was Robert Johnson.

18.     The Bronx County District Attorney was and remains designated as a "local officer" under New York Public Officers Law §2.

19.     Pursuant to New York County Law §53, "each county shall be liable under the same rules of law applicable to the state, for damage or injury, or death, to person or property sustained by reason of the torts of its officers, agents, servants and employees."

20.     The Bronx County District Attorney had final authority and constituted a policymaker for the CITY OF NEW YORK, for whom the CITY OF NEW YORK is therefore liable with respect to decisions concerning the hiring, management, training, supervision, discipline, and termination of personnel employed by the Bronx County District Attorney's Office.

21.     This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This action arises, *inter alia*, under 42 U.S.C. § 1983 and § 1988, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

22.     This Court has supplemental jurisdiction over plaintiff's claims arising under state law because they are so related to the federal claims that they form part of the same case and/or controversy.

23.     A substantial part of the events and/or omissions giving rise to the claims herein occurred in the County of Bronx, State of New York, and venue in the United States District Court for the Southern District of New York is therefore proper.

**Procedural History**

24.     Plaintiff was arrested in connection with the investigation that is the subject of this action on or about August 31, 2006, and taken into custody as of that date.  He remained detained throughout his trial.

25.     Plaintiff was indicted for the murder.  The indictment was premised, in whole or in substantial part, on false information and/or testimony.

26.     On July 13, 2007, following a trial, plaintiff was convicted by a jury of Murder in the Second Degree in connection with the death of Sean Worrell.

27.     On August 16, 2007, plaintiff was sentenced by the Honorable Robert Torres of the Supreme Court, Bronx County, to a term of incarceration of 22 years to life.

28.     The conviction was affirmed on direct appeal by the Appellate Division, First Department, by decision dated March 11, 2010.  *See People v. Jimenez*, 71 A.D.3d 483 (1st Dept. 2010).  Leave to appeal to the Court of Appeals was denied on June 30, 2010.  *See People v. Jimenez*, 15 N.Y.3d 742 (N.Y. 2010).

5

29.     In or around September of 2011, plaintiff filed a motion pursuant to CPL §440.10 to vacate his conviction in the Supreme Court of the State of New York, County of Bronx.

30.     The motion was denied on March 4, 2014, by the Supreme Court, Bronx County.

31.     The Appellate Division, First Department, reversed that order to the limited extent of directing that a hearing be held with respect to whether "the People committed a violation pursuant to *Brady v. Maryland* by not disclosing the terms of an agreement to assist in a sentence reduction for People's witness Andrew O'Brien, if such an agreement existed." *People v. Jimenez*, 142 A.D.3d 149 (1st Dept. 2016).

32.     Upon remand, the Supreme Court, Bronx County, conducted a hearing, following which it again denied the motion.

33.     Leave to appeal this decision was denied, both by the Appellate Division, First Department, and the New York State Court of Appeals.

34.     Plaintiff filed a petition for a writ of habeas corpus in the United States District Court, Southern District of New York, on September 9, 2011, which was during the pendency of plaintiff's CPL §440.10 motion.

35.     Plaintiff's habeas corpus petition was stayed by order of the Honorable J. Paul Oetken, pending conclusion of state court proceedings.  The stay was subsequently lifted following the conclusion of such proceedings.

36.     On July 15, 2022, Judge Oetken granted plaintiff's petition for a writ of habeas corpus, vacating his judgment of conviction and restoring his case to pretrial status.

37.     On April 10, 2023, plaintiff's indictment was dismissed in its entirety by order of the Honorable Alvin O. Yearwood of the Supreme Court of the State of New York, County of Bronx.

38.     The dismissal of the indictment, on the People's motion, was on the merits.

39.     On April 21, 2023, plaintiff duly and timely served a Notice of Claim on the CITY OF NEW YORK, pursuant to General Municipal Law §50-e.

40.     On July 25, 2023, plaintiff duly appeared for a hearing noticed by the CITY OF NEW YORK pursuant to General Municipal Law §50-h.

41.     More than thirty days have elapsed since the service of said Notice of Claim and defendant CITY OF NEW YORK and its Comptroller have failed to settle, adjust, and/or compromise the claims set forth therein.

42.     This action has been brought within one year and ninety days from the accrual of the causes of action set forth herein.

43.     This action is timely brought against all parties.

## Facts

44.     On July 3, 1989, shortly after midnight, Sean Worrell was killed in the Whitestone Movie Theater in Bronx, New York, where he was attending a showing of "Batman."  A verbal altercation broke out at a concession stand involving Worrell, his associates, and another man. The other man then, according to the People, retrieved a gun, returned to the theater, and engaged in a shootout with Worrell and his associates, who also were carrying firearms.  Worrell was shot and killed.

45.     The NYPD opened an investigation into the murder.  The case was assigned to the 45th Precinct Detective Squad in Bronx County, including, but not limited to, defendants MICHAEL SERRANO and CHRISTOPHER HORN, who at all times herein mentioned were employed by the New York City Police Department as Detectives.

46.     Defendant SERRANO was the lead detective and/or otherwise was assigned to the investigation.

47.     Defendant HORN was the lead detective and/or otherwise was assigned to the investigation.

48.     Defendants SERRANO and HORN acted in concert with one another throughout the course of the investigation and conferred regularly for such purpose.

49.     Multiple bystanders who had been in the theater described the shooter to the police.  Per these descriptions, it emerged that the shooter was a Black man with distinctive bleached blond stripes in his hair, who spoke with a Jamaican accident.  *See* Exhibit A.

50.     One of the bystanders who described the shooter in such a fashion was Esco Blaylock, a teenager employed by the movie theater.  On July 3, 1989, which was the same day as the shooting itself, Blaylock spoke with both SERRANO and HORN.  He described the shooter as a Black man named Leon with gold stripes in his hair and a gold tooth.  Blaylock said that he had known Leon for two years and that Leon dated a young woman he knew named Sharon.  He provided other and further descriptive details about Leon as well.  *See* Exhibit B.

51.     Defendants SERRANO and/or HORN identified Sharon, whose full name was Sharon Ramroop, and spoke with her.  She said that she, in fact, knew a man named Leon from the neighborhood.  He was of "Jamaican/Indian" heritage. She provided other and further descriptive details about Leon as well.

52.     The NYPD, however, failed to locate Leon.

53.     On July 11, 1989, defendants SERRANO and/or HORN, in their words, "confronted" Blaylock and Ramroop at the precinct.  *See* Exhibit C.  The two teens were unaccompanied by any parent or guardian.  Following a prolonged encounter at the station, and

as a result of coercion, suggestion, inducement, and/or otherwise improper conduct by

defendants SERRANO and/or HORN, their identification of Leon, a Black man with a Jamaican

accent and blond streaked hair, improbably morphed into a claim by Blaylock that the shooter

was Ricardo Jimenez.

54.     JIMENEZ did not match the description of the shooter provided by bystanders.

Jimenez is Hispanic, did not have streaks died into his hair, and, suffice it to say, is not named

Leon.  He did not match the bystanders' description of the shooter.

55.     After a highly suggestive "single photo" identification procedure, Blaylock

purportedly identified JIMENEZ as the shooter.  (Ex. C).  Following this encounter, defendants

SERRANO and/or HORN had other and further improper contact with Blaylock and/or

Ramroop.

56.     Defendants SERRANO and/or HORN knew these statements by Blaylock and

certain statements by Ramroop were false and proceeded nonetheless.

57.     Ramroop later recanted and/or repudiated the statements attributed to her by

defendants HORN and/or SERRANO.  She said that she did not know JIMENEZ and never

validly identified him to the police, contrary to their claims.  She signed a statement to that

effect.  *See* Exhibit D.

58.     Defendants SERRANO and/or HORN should have known these statements by

Blaylock were false and recklessly proceeded nonetheless.

59.     Other witnesses provided details that ruled out plaintiff as the shooter, which was

known to SERRANO and/or HORN  One of them even knew JIMENEZ and said he was not

there, and told SERRANO and/or HORN as much.  Despite the fact that many people who were

in the theater saw the shooting or relevant events surrounding it, the *only* one who ultimately

claimed the shooter was JIMENEZ was Blaylock – and that was only after he was "confronted" by police and forced to abandon the original description he gave, which was consistent with what the other bystanders had said as well.

60.     JIMENEZ was detained and/or arrested, but then subsequently was released when Blaylock recanted and/or otherwise did not appear for a lineup.

61.     Notably, even though the police knew of numerous other witnesses from the theater who had witnessed the shooting, *none* were even *asked* to come in for a lineup other than Blaylock, not even when Blaylock recanted and the case was going to be dropped for want of an identification.  The reason for that is because defendants knew that these other witnesses, who had identified an entirely different person, would not identify JIMENEZ as the shooter.  The case then lay dormant for more than a decade.

62.     In or around the year 2000, defendant STRADFORD, in his capacity as a member of the New York City Police Department's Cold Case Squad, assumed responsibility for the Worrell case.

63.     STRADFORD made contact with Blaylock and coerced and/or otherwise improperly induced him to reverse course yet again and agree to testify against JIMENEZ.

64.     STRADFORD knew and/or should have known that Blaylock's purported identification of JIMENEZ was untrue.

65.     During post-conviction proceedings, Blaylock told an investigator that, when STRADFORD met with him in 2006, he was shown multiple photo arrays, in which JIMENEZ' photo appeared in each successive array but the other photographs changed.  He likened it to a game of "Where's Waldo?"  He also made further statements reflecting that his original identification of JIMENEZ after being "confronted" was not accurate.  *See* Exhibit E.

66.     STRADFORD also initiated contract with a man named Andrew O'Brien.

67.     O'Brien was a former associate of Worrell's and had been a member of a criminal enterprise called the Poison Clan.  He was serving a 30-year term of incarceration in federal prison.  He originally was sentenced to a longer term of imprisonment, but obtained a sentence reduction after cooperating against Dean Beckford, one of the former leaders of the Poison Clan.

68.     In early 1997, in connection with the plea deal that led to his incarceration, O'Brien met with FBI agents over the course of a number of lengthy sessions, in which he exhaustively detailed his knowledge of crimes.  The memorandum of these sessions spanned more than thirty single-spaced pages.  *See* Exhibit F.  One crime he did *not* claim to have any knowledge of was the Whitestone theater shooting.  During one session, the agents showed him a photograph of Sean Worrell.  He said that he recalled Worrell was killed in a movie theater, but did not even say he was there, let alone that he had knowledge of who did it.  In fact, he did not even accurately recall Worrell's name, referring to him as "Morrell."

69.     After obtaining a reduction in return for his cooperation against Beckford, O'Brien engaged in a campaign to obtain a further sentence reduction, which included writing letters to the judge who was responsible for his case and reaching out directly to the prosecutor, AUSA David Novak.  In one of his letters to the judge, he referred to himself as a "desperate man."

70.     STRADFORD spoke to and/or met with O'Brien, who had not known JIMENEZ previously, including multiple meetings and phone calls.

71.     Even  before STRADFORD visited O'Brien, he had settled on JIMENEZ as the perpetrator.  As set out in JIMENEZ' habeas petition:

In a form request to interview O'Brien, who was in a Bureau of Prisons protected witness program, the FBI agent working with Stradford asserted that O'Brien had "first hand knowledge" of the Worrell homicide, "[s]pecifically," the agent wrote, "[O'Brien] witnessed the murder being committed by RICARDO JIMENEZ." O'Brien, however, did not know Mr. Jimenez, so he could not have named him a suspect prior to the interview, and the first time he ever saw a photograph of Mr. Jimenez was, purportedly, at this interview…

72.    Following contacts with STRADFORD and after a suggestive procedure, O'Brien falsely implicated JIMENEZ as the shooter.

73.    O'Brien falsely inculpated JIMENEZ due to inducement and/or other and further suggestive and/or otherwise improper conduct by STRADFORD.  In fact, O'Brien had no knowledge that would tend to inculpate JIMENEZ, and STRADFORD knew O'Brien's claims about JIMENEZ to be untrue.

74.    STRADFORD knew and/or should have known that O'Brien's implication of JIMENEZ was false.

75.    After implicating JIMENEZ, O'Brien continued to have telephonic and personal contact with the NYPD, including STRADFORD.

76.    At and/or following the time STRADFORD assumed responsibility for the case, the Bronx County District Attorney's Office assigned Assistant District Attorney Lisa Mattaway (hereinafter "Mattaway") to the case as well.

77.    Mattaway met and/or otherwise had contact with O'Brien as well.

78.    STRADFORD was present when Mattaway met with O'Brien.

79.    STRADFORD and/or Mattaway had conversations and/or correspondence with AUSA Novak concerning O'Brien.

80.    On June 4, 2007, she spoke with AUSA Novak on the phone and then e-mailed him to follow up.  She wrote in the e-mail that she "would like Andrew O'Brien to testify for me

here in Bronx Supreme [C]ourt."  She requested from Novak copies of "any cooperation agreements he has made in exchange for his testimony with the Federal government and any information regarding favorable treatment he may have received in exchange for his cooperation, including his placement in the witness protection program." She continued: "I am aware that he has written numerous letters to the judge in his case requesting leniency and if any of those letters mention the possibility he may testify here in Bronx Supreme [C]ourt for me, I imagine I will need copies of those letters too."

81.     Novak mailed her a packet of materials several days later.  These materials included, among other things: (1) the FBI memo showing that O'Brien had no apparent knowledge of the shooting in his 1997 proffer sessions; (2) his letters to the judge in his own case pleading for a further reduction and describing himself as "desperate"; (3) the U.S. Attorney's prior, successful motion for a sentence reduction on O'Brien's behalf; (4) the transcript of O'Brien's prior trial testimony against the Poison Clan's leader that led to this reduction.  *See* Exhibit G.

82.     Novak specifically flagged for her in his letter that the materials could be *Brady* material. He wrote that he was providing her the documents "for your determination as to whether they are discoverable."

83.     Mattaway not only withheld <u>all</u> of these materials, but intentionally elicited testimony contrary to the contents of the documents to gain tactical advantage at trial.

84.     O'Brien agreed to implicate and testify against JIMENEZ with the explicit and/or implicit understanding that, in return for doing so, defendants would work to obtain a sentence reduction for him in connection with his federal sentence.

85.     JIMENEZ was arrested on or about August 31, 2006, and taken into custody as of that date.

86.     There was no legitimate probable cause for his arrest.

87.     Defendants forwarded false, improperly procured information to the Bronx County District Attorney's office.

88.     Defendants knew that the false information they had provided and/or facilitated would be relied upon by the District Attorney's office and/or the Grand Jury and/or by a jury at trial.

89.     Defendants failed to produce exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972) and otherwise violated the principles expressed in *Napue v. Illinois*, 360 U.S. 264 (1959).

90.     Blaylock, Sharon, and O'Brien, and/or other persons provided false information as a result of improper conduct by defendants HORN, SERRANO, and/or STRADFORD.

91.     Defendants HORN, SERRANO, and/or STRADFORD acted with actual malice, including, but not limited to, that they were motivated by desires and purposes other than to see the ends of justice done.

92.     Other witnesses told the NYPD specifically that JIMENEZ was not the perpetrator and/or described the shooter in such terms as to rule out JIMENEZ, which was known to SERRANO, STRADFORD, and/or HORN.

93.     Beckford, who was with Worrell in the theater on the night of the shooting, has also said that JIMENEZ was not the perpetrator.

94.     Blaylock attempted to avoid testifying and had to be retrieved personally by STRADFORD shortly before his appearance.

95.     Had prosecutors known of the falsity of the identifications of plaintiff, it would have vitiated the arrest.  There was no other evidence on which the arrest was reasonably supported and legitimate probable cause was lacking.

96.     After JIMENEZ was arrested, he was detained at Rikers Island.

97.     Following JIMENEZ' detention at Rikers Island, another person in custody, Kevin Morrissey, contacted the Bronx County District Attorney's Office and claimed that JIMENEZ had confessed to him.  Morrisey had a litany of pending charges against him.  He was a serial jailhouse informant who had worked with District Attorneys' offices in numerous other cases.

98.     In addition to a lengthy rap sheet, Morrisey also had a history of mental illness, including schizophrenia.  He previously had written a letter to a federal judge reporting that there was a man named Ray Sanchez living inside his body, who had committed the crimes of which he was accused.

99.     JIMENEZ never made any inculpatory statement to Morrisey.

100.    Mattaway, who had been with the Bronx DA's office for nearly twenty years at the time of the trial, was steeped in its culture and customs.  That culture included an ongoing and systemic lack of accountability for ADAs who committed *Brady* violations or otherwise engaged in trial misconduct in pursuit of convictions.  She knew that convictions would be rewarded and that boundary pushing would have no adverse professional consequence with the BCDAO.

101.    The BCDAO, including through Mattaway, flagrantly violated *Brady* by withholding highly material exculpatory evidence from JIMENEZ' defense lawyer.

102.    She failed to disclose to JIMENEZ' counsel documents demonstrating that O'Brien was testifying against JIMENEZ with the expectation of a sentence reduction.  This included, among other things: (1) O'Brien's plea agreement in his federal case indicating that he

was cooperating against co-defendants and that a sentence reduction was possible; (2) the fact that he already had received a sentence reduction for cooperation, pursuant to order; (3) copies of letters O'Brien wrote to a federal judge seeking a further reduction; and (4) e-mails and other communications, including between Mattaway and AUSA David Novak, discussing, among other things, O'Brien's testimony and Mattaway's knowledge he had been writing letters seeking a further reduction to the judge.

103.     The BCDAO, including through Mattaway, also failed to disclose documents showing that, when O'Brien was interviewed by the federal government about his prior criminal activities in or around the years 1996 and/or 1997, he did not claim to have any knowledge about who perpetrated the Worrell shooting.

104.     The BCDAO, including through Mattaway, committed numerous other *Brady* violations as well.  This also included, but was not limited to, withholding information about Morrisey, including his criminal history; numerous past incidences of cooperation with DA's offices against other defendants, including an effort to provide information against John Gotti that was false; and his history of delusion and mental illness, including schizophrenia.

105.     In addition, the BCDAO withheld further evidence, including about O'Brien and Morrisey.  It also delayed production of portions of the detective file and other materials to impede or prevent their effective use by the defense.

106.     In her witness disclosure, Mattaway misrepresented the nature of her arrangement with O'Brien.  She disclosed only the following: '[C]urrently jailed in Federal Custody for Murder (unrelated) and serving 30 years.  Has asked for a letter to be prepared by the undersigned that he can have put in his file stating that he testified for the Bronx District Attorney's Office.'"  *See* Exhibit H. This misrepresented what was actually happening. The letter

was not being "put in" a "file."  It was being sent to AUSA Novak, who already had previously

filed a sentencing reduction motion on O'Brien's behalf, and had corresponded with Mattaway in

advance of trial.  Everyone involved in this interaction knew exactly what was going to happen

after trial: Mattaway was going to write a letter to AUSA Novak about O'Brien's cooperation,

which would serve as a potential basis for a further sentence reduction motion.

107.    Mattaway elicited testimony from O'Brien that was directly contrary to the

contents of the documents she had withheld.  Even though she was aware O'Brien had not said

anything about the shooting to the FBI in his proffer sessions, she elicited testimony from him

that he first told the FBI in or around 1996 that he had been in the Whitestone theater and knew

who the shooter was:

> Q:  Do you remember the first time you told anyone in law enforcement about what
> happened?
> A:  Yes.
> Q:   And when was that approximately?
> A:  That was in – that was in – I think it was '96.
> Q:  Okay.  And do you remember how you first decided to tell somebody about this?  Did
> you write them?  Did you call someone?  What happened?
> A:  Well, I was being – I was being questioned by federal agents and they asked me, you
> know, of certain things that I knew about and this was one of them.

This was completely untrue; the undisclosed 1997 FBI memo showed that he said nothing of the

sort.

108.    Mattaway then elicited further false testimony from O'Brien about what he

expected to receive from cooperating. He testified as follows:

> Q:  What is your understanding of what if anything I can or will do for you in exchange
> for you testifying here today for us?
> A:  Well, my understanding is that you'll just tell the Federal prosecutors I cooperated
> with y'all and that's it.
> Q: Are you a sentenced prisoner?
> A: Yes.
> Q: And you said you have 18 years to go?
> A: Yes.

> Q:  Are you presently doing this for anybody else?
> A: Doing what?  What I'm doing here?
> Q: Yes.
> A:  I'm basically doing it just because it's a lot of different reasons.
> Q: Why are you doing this?
> A:  Well, one is that I felt guilty because, you know, I kind of like started the argument with the guy, with the person.

He proceeded to claim that he was required to testify against Jimenez as part of his existing cooperation agreement with the federal government, conveying the further false impression that he was merely complying with his existing deal and would be penalized if he did not:

> Q: You have to cooperate with any law enforcement people, is that you're telling us?
> A: Of crimes I may have been part of, or known of, if I kept it to myself they could rip up my agreement and everything else.

Mattaway, who possessed O'Brien's original cooperation agreement and knew that it provided he could receive further sentencing reductions under Federal Rule of Criminal Procedure 35 if the government deemed it appropriate was well aware this was untrue.

109.    STRADFORD then bolstered the illusion that O'Brien had revealed knowledge of the shooting to the FBI in his 1997 proffer session in his own testimony.  He testified that in 1999, after taking on the file, he contacted the DEA to "have them produce some files for me that might have been related to the homicide in question."  Mattaway asked, "Did there come a time that you actually got some paperwork?"  STRADFORD answered that he did and that, after reviewing it, he contacted the FBI and made arrangements to meet O'Brien himself, indicating to the jury that the paperwork reflected knowledge on O'Brien's part of JIMENEZ' guilt.  This paperwork, unbeknownst to anyone other than Mattaway and STRADFORD, did not even *suggest* that O'Brien had knowledge of the movie theater shooting.  STRADFORD testified that he met with O'Brien in January of 2001 and that O'Brien agreed to implicate JIMENEZ.

110.    In these and other respects, the People's case was built to take maximal advantage of the *Brady* violations.

111.    After the trial, Mattaway penned a letter – addressed directly to Novak, and not to a "file" – gushing about O'Brien's cooperativeness.  She wrote that his testimony was "crucial to the People's case" and urged Novak to "give Mr. O'Brien whatever consideration you can in your position" because he "came through for me when I needed him and then some."  O'Brien received a five-year sentence reduction for his efforts.

112.    Defendants SERRANO, HORN, and/or STRADFORD falsely testified concerning their alleged interactions with Blaylock and/or O'Brien, including, but not limited to, before the Grand Jury and/or at trial.

113.    JIMENEZ was ultimately convicted of Murder in the Second Degree.

114.    At his sentencing hearing on August 16, 2007, JIMENEZ steadfastly maintained his innocence.  He said: "All I can say right now is I'm sorry for the family, what happened to their family, but I didn't do it.  I was never there at that movie theater when that happened.  The court system is unfair, unfair trial.  You need to look deep into the case.  We both had loss, my family, their brother, their brother, father, nephew.  The court system needs to look deeper into it."

115.    Following the trial, AUSA Novak followed up with Mattaway about the letter for O'Brien.  Mattaway wrote a gushing letter about O'Brien, based upon which Novak filed a motion to further reduce O'Brien's sentence.  The motion was granted and O'Brien's sentence was reduced by five years.

116.    Each and all of the acts and omissions set forth herein were undertaken in clear violation of plaintiff's established constitutional rights and no reasonably competent police officer could have believed otherwise.

117.    Each and all of the defendants knew of the foregoing acts of misconduct by their fellow officers, including, but not limited to, at and/or substantially contemporaneously with the time such acts took place.

118.    Each and all of the defendants were deliberately indifferent to the violations of plaintiff's rights.

119.    The actions by the individual defendants set forth herein were willful, wanton, reckless, and/or intentional, and warrant the imposition of punitive damages.

120.    As a result of his wrongful conviction, plaintiff lost years of his life to incarceration, suffered psychological trauma that will follow him for the rest of his life, missed milestone events, lost wages and suffered a diminution in earning capacity, and suffered other and further damages.[1]

### As and For a First Cause of Action against defendants SERRANO, HORN, and STRADFORD:  Malicious Prosecution Pursuant to 42 U.S.C. §1983

121.    Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 120 as though set forth more fully herein.

121.    Defendants SERRANO, HORN, and/or STRADFORD initiated the proceeding against plaintiff.

---

[1] This Amended Complaint incorporates by reference as exhibits hereto the documents filed in *Jimenez v. Graham*, 11-cv-06468 (JPO) at Docket Nos. 37 and 56, including the annexed exhibits and subparts.  These documents are JIMENEZ' Second Amended Petition for a Writ of Habeas Corpus and his Reply Memorandum of Law, together with their supporting exhibits and materials.

122.     The proceeding against plaintiff with respect to the murder terminated in his favor, with the dismissal of such charges on April 10, 2023.

123.     The fabricated and/or otherwise improperly obtained evidence against plaintiff was the basis for his arrest and/or indictment for murder.

124.     In the absence of false, fabricated, improperly created and/or obtained evidence, there was not probable cause to arrest and/or indict plaintiff for murder.

125.     The decisions to arrest and/or indict plaintiff for murder relied substantially and/or entirely upon the false, fabricated, improperly created and/or obtained evidence.

126.     Defendants were motivated by actual malice, including, but not limited to, in that each and all of them knew that the evidence against plaintiff had been fabricated and/or otherwise improperly created and/or obtained, and/or were motivated by some purpose other than to see the ends of justice served.

127.     By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

128.     Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities secured by the United States Constitution, including, but not limited to, the Fifth, Sixth, and Fourteenth Amendments thereto.

129.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

130.     By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

131.     Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

### As and For a Second Cause of Action against SERRANO, HORN, and STRADFORD: Denial of Fair Trial Rights Pursuant to 42 U.S.C. §1983

132.     Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 131 as though set forth more fully herein.

133.     Defendants SERRANO, HORN, and STRADFORD were investigating officials with respect to plaintiff's purported involvement in the murder of Sean Worrell.

134.     Defendants SERRANO, HORN, and STRADFORD acting individually and/or in concert, fabricated evidence, including, but not limited to, the known false statements implicating plaintiff in the murder.

135.     Defendants SERRANO, HORN, and STRADFORD knew that the fabricated evidence would be likely to influence a jury's decision.

136.     Defendants SERRANO, HORN, and STRADFORD forwarded the fabricated evidence to prosecutors, and/or facilitated Grand Jury testimony with respect to the foregoing.

137.     Defendants failed to produce to the District Attorney's Office exculpatory information that would have materially benefitted the defense, thereby bringing about violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972).

138.     The conduct as aforesaid caused plaintiff's wrongful conviction.

139.     By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

140.     Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities secured by the United States Constitution, including, but not limited to, the Fifth, Sixth, and Fourteenth Amendments thereto.

141.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

142.     By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

143.     Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

**As and For a Third Cause of Action against defendants SERRANO, HORN, and STRADFORD: Failure to Intervene Pursuant to 42 U.S.C. §1983**

144.     Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 143 as though set forth more fully herein.

145.     Defendants SERRANO, HORN, and STRADFORD failed to intervene to prevent, end, or report the unconstitutional conduct to which plaintiff was subjected, despite the fact that they had opportunities to do so.

146.     Had any of them come forward, it would have prevented plaintiff from being wrongfully convicted, and had any of them come forward during his incarceration, it would have resulted in his freedom.

147.     Defendants SERRANO and HORN conducted the initial coercive interrogation of Ramroop and Blaylock together.  Each of them were aware of the other's conduct in procuring

the teenagers' untrue implications of JIMENEZ.  Blaylock originally identified a different

person.  Ramroop subsequently admitted she had never seen JIMENEZ before.  Their joint

implication of JIMENEZ, after having been, in the detectives' words, "confronted" at the

precinct came about through misconduct, as outlined in greater detail above.

148.    Defendants SERRANO, HORN, and STRADFORD were deliberately indifferent

to plaintiff's rights, including, but not limited to, his right to be free from a conviction based on

fabricated evidence and falsehoods.

149.    By reason of their conduct, plaintiff was subjected to a deprivation of liberty,

including, but not limited to, in his pretrial detention and subsequent incarceration.

150.    Defendants, under color of state law, subjected plaintiff to the foregoing acts and

omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities

secured by the United States Constitution, including, but not limited to, the Fifth, Sixth, and

Fourteenth Amendments thereto.

151.    By reason of the foregoing, plaintiff suffered severe damages, including, but not

limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or

psychological injuries, economic loss, the need for future medical care, and other and further

damages.

152.    By reason of the foregoing, plaintiff demands judgment against the defendants in

the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the

individual defendants.

153.    Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

**As and For a Fourth Cause of Action against the CITY OF NEW YORK and BRONX
COUNTY DISTRICT ATTORNEY'S OFFICE, Pursuant to 42 U.S.C. §1983 and *Monell v.
Department of Social Services of City of New York*, 436 U.S. 658 (1978).**

154.    Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 153 as though set forth more fully herein.

155.    Mattaway's conduct in withholding exculpatory evidence and denying JIMENEZ a fair trial was a product of the longstanding culture of the Bronx County District Attorney's Office, in which prosecutors were allowed to violate ethical norms and well settled legal rules with impunity.

156.    In the BCDAO, from "1975 through 1996, during the administration of three District Attorneys, there was just *one* incidence of any prosecutor being disciplined" for violating *Brady* or otherwise presenting false, misleading, or inflammatory evidence or summation argument.  *See* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537, 549 (2011) (*see* Exhibit I).

157.    In another civil case, defendant CITY OF NEW YORK was directed to name the prosecutors involved in seventy-two misconduct related reversals and produce their personnel files.  The documents revealed that the BCDAO imposed virtually no consequences whatsoever for *Brady* or other ethical violations by its prosecutors:

> The records… revealed that from 1975 through 1996, during the administration of three District Attorneys, there was just one incidence of any prosecutor being disciplined. This prosecutor was one of fourteen prosecutors who had been involved in more than one of the trials in which misconduct had been found.  A second prosecutor had conducted five of the trials, while a third had conducted four, yet neither of these latter two prosecutors, according to the records, had ever been disciplined. Indeed, the District Attorney's Office conceded that payroll and other records "do not indicate the existence of any disciplinary measures taken against any of the ADAs."

Ex. I, 549-50 (cleaned up).

158.    The only ADA who was disciplined was a prosecutor who had been the subject of multiple appellate reversals.  Despite his prior instances of misconduct, he had received annual

raises.  After a reversal in which the Appellate Division cited the Code of Professional

Responsibility in condemning his conduct, he was deducted four weeks of pay.  He then received

a *bonus* and raise within the next two months, completely making up for the "discipline" and

then some.  *See id.* at 551.  He then was the subject of further reversals, notwithstanding which

he received raises, laudatory performance reviews, and promotions.  *See id.* at 551-52.

159.    There were multiple other ADAs who were the subject of repeat appellate

reversals and suffered no adverse consequences at all or even received raises.

160.    During this time period, upon information and belief, *no* and/or substantially no

prosecutors were disciplined for violating *Brady*.

161.    The office had no written code of conduct or policy setting forth rules of behavior

or specifying consequences for trial misconduct.  There was also no policy in place of referrals

for professional discipline in the event of unethical conduct.  These deficiencies persisted, in

whole and/or substantial part, up to and through the time of JIMENEZ' conviction.

162.    In testimony given on behalf of defendant CITY OF NEW YORK in a deposition,

Odalys Alonso, the BCDAO Chief Assistant District Attorney, testified to the following effect:

> Testifying as a representative witness under Federal Rule of Civil Procedure 30(b)(6) on
> the issue of discipline at the Office, Alonso acknowledged that neither the Office's
> standard employment agreement, nor its employee manual, nor any other document,
> contains any provisions concerning internal disciplining of prosecutors for misconduct in
> connection with the handling of criminal cases. The Office has no written policy or
> procedure setting forth specific rules of behavior, defining infractions of such rules—
> including whether punishment may be inflicted for negligence, recklessness, or deliberate
> indifference to defendants' constitutional rights as opposed to willful, deliberate
> violations—or providing notice of the types of discipline that may be imposed for
> infractions. The "system" for discipline is that the District Attorney is told when court
> decisions or defense motions or appeals alleging improper behavior are received by the
> Office, and then he determines whether to conduct an investigation or to impose some
> form of discipline.  There is no standard for determining when discipline will be imposed,
> other than the subjective judgment of the District Attorney. Alonso, who has been a
> supervisor or a member of the executive staff during Johnson's entire twenty-two-year
> tenure in office, recalled only a single instance of formal discipline, occurring in January

2002….Neither could District Attorney Johnson. In the incident recalled by Alonso, Johnson himself happened to walk into a courtroom where one of his Assistant District Attorneys was delivering a summation and was offended that it contained gratuitously inflammatory content. Alonso testified that Johnson immediately instructed that Assistant District Attorney's supervisor to discipline the Assistant District Attorney, which she purportedly did through an oral admonishment and by withholding any raise or bonus at the prosecutor's next salary review. However, no records were produced evidencing that such sanctions were imposed. On appeal, the Office fully defended the Assistant District Attorney's conduct as appropriate.  Alonso did testify, however, that she was told by her predecessor, Chief Assistant District Attorney Kluger, that under Johnson's policy, whenever the Appellate Division reversed convictions for summation misconduct, he would orally chastise the Assistant District Attorney if he or she was still in the Office. despite the supposed finding by the District Attorney himself that the prosecutor had behaved so inappropriately that he deserved to be sanctioned. This was the single prosecutor during Johnson's twenty-two years in office that anyone could recall was formally "disciplined" for violating a rule of behavior in the prosecution of a criminal case.

Ex. I, 556-57.

163.    While doing nothing to track or enforce ethical compliance, the office rigorously tracked ADAs' conviction rates.

164.    The office was the subject of numerous appellate reversals for prosecutorial misconduct, representing a pattern.  *See* Appendix A.  The BCDAO did nothing and/or substantially nothing to address it, evincing deliberate indifference to the constitutional rights of accused persons.

165.    The BCDAO had long defended ADAs' misconduct in appellate proceedings and otherwise and imposed neither discipline nor professional consequences for violations of defendants' rights.

166.    For example, in 1984, Albert Ramos, a college student and part-time childcare daycare center employee, was arrested for allegedly raping a five-year-old girl.  He was convicted by a jury in May of 1985.  After he had been incarcerated for approximately seven years, it emerged that the prosecutor had withheld a number of different items of exculpatory

evidence.  Ramos filed a motion to vacate his conviction, which was granted.  The BCDAO

appealed and defended her conduct, denying even that she had violated *Brady*.  The First

Department affirmed, finding that People's "failure to fulfill their obligation to insure that a fair

trial was had and justice done is inexcusable." *People v. Ramos*, 201 A.D.2d 78, 90 (1st Dept.

1994).  The People then dismissed the charges instead of pursuing a retrial. The Grievance

Committee opened an ethical investigation.  The BCDAO submitted a letter defending the ADA.

She faced no formal adverse internal consequences either.

167.     The Jimenez trial showed the BCDAO's disregard for *Brady* on full display.

Mattaway was in possession of substantial *Brady* material, which could easily have been

produced but was withheld to obtain the maximal possible advantage.  She painted O'Brien – the

People's key witness – as a reformed gang member who had seen the light and was coming

forward out of a desire to see justice done.  In her summation, she said of him: "Andrew O'Brien

who faced his own troubles in the years following and yeah he's doing time for his own

problems, he never forgot it."   In actuality, he was testifying with the expectation of a (second)

sentence reduction about events he had not mentioned during his extensive proffer sessions in

1997 – things which the defense would have known, had she discharged her *Brady* obligations.

She capitalized on the *Brady* violations, which clearly were willful, at every turn. This included

eliciting untrue testimony from O'Brien and STRADFORD, and misrepresenting the nature of

O'Brien's arrangement with her office on her witness disclosure.

168.     Another document she withheld reflected that O'Brien *himself* had been

considered a prime suspect in the shooting and was even nearly arrested for it.

169.     She also withheld exculpatory information about Kevin Morrissey, who was so

patently incredible that federal prosecutors in an unrelated case withdrew him as a witness and

the Bronx DA's office here, after JIMENEZ' conviction was vacated, said in open court that it would not call him even in the event of a retrial.

170.     The *Brady* violations were particularly consequential here, given the weakness of the People's case.  Indeed, even despite the People's numerous *Brady* violations, the jury deliberated from July 10, 2006, until July 13, 2006, before returning with a verdict.  Mattaway's misconduct, and/or that of the BCDAO, was a proximate cause of the wrongful conviction.

171.     The Bronx County District Attorney's Office, by and through its policymaking officials, acted with deliberate indifference to the rights of individuals who had been charged with crimes; implemented or tolerated plainly inadequate policies, and/or the lack of any policies at all; and tolerated and encouraged practices and customs in the office, including of failing to make full and timely *Brady* disclosures and/or otherwise engaging in discovery or trial misconduct.  This systemic lack of consequences rose to the level of a *de facto* policy in the Bronx County District Attorney's Office.

172.     The CITY OF NEW YORK and BRONX COUNTY DISTRICT ATTORNEY'S OFFICE were deliberately indifferent to the rights of criminal defendants to a fair trial, free from violations of *Brady, Rosario, Giglio, Napue*, and other forms of prosecutorial misconduct.

173.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

174.     By reason of the foregoing, plaintiff demands judgment against defendants CITY OF NEW YORK and BRONX COUNTY DISTRICT ATTORNEY'S OFFICE in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS).

175.     Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

**As and For a Fifth Cause of Action: Malicious Prosecution Under New York State Law**

176.     Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 175 as though set forth more fully herein.

177.     Defendants initiated the proceeding against plaintiff.

178.     There was a lack of probable cause.

179.     The proceeding against plaintiff with respect to the murder terminated in his favor with the dismissal of such charges on April 10, 2023.

180.     The false, fabricated and/or otherwise improperly obtained evidence against was the basis for his arrest and/or indictment for murder.

181.     In the absence of the false, fabricated, improperly created and/or obtained evidence, there was not probable cause to arrest and/or indict plaintiff for murder.

182.     The decisions to arrest and/or indict plaintiff for murder relied substantially upon the false, fabricated, improperly created and/or obtained evidence.

183.     Defendants were motivated by actual malice, including, but not limited to, in that each and all of them knew that the evidence against plaintiff had been fabricated and/or otherwise improperly created and/or obtained, and/or were motivated by some purpose other than to see the ends of justice served.

184.     By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

185.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or

psychological injuries, economic loss, the requirement for future medical care, and other and further damages.

186.     By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

### As and For a Sixth Cause of Action against CITY OF NEW YORK: Common Law Negligence

187.     Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 186 as though set forth more fully herein.

188.     Defendant CITY OF NEW YORK was negligent in the hiring and retention of the defendant officers.

189.     Defendant CITY OF NEW YORK knew and/or should have known that the aforesaid officers were not fit to continue in such employment, including, but not limited to, based upon the acts set forth herein.

190.     Defendant was negligent in training the defendant officers, including, but not limited to, in its failure to provide good and sufficient training with respect to procedures to avoid the production of false confessions and/or statements, and in failing to supervise and/or supervise adequately said officers.

191.     Defendant knew and/or should have known that the lack of such training and/or supervision would produce violations of right and/or injuries to persons, including, but not limited to, the plaintiff herein.

192.     Defendant is liable for the negligent acts of its employees, to the extent set forth above.

193.     Defendant's negligence caused plaintiff's wrongful conviction.

194.    By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

195.    By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS).

### Conclusion

WHEREFORE, plaintiff demands judgment against the defendants in the sum of $50,000,000.00; punitive damages against defendants STRADFORD, SERRANO, and HORN; attorneys' fees, pursuant to 42 U.S.C. § 1988 and the inherent powers of the Court; the costs and disbursements of this action; and such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
       January 8, 2024

Yours, etc.,

KELNER & KELNER, ESQS.,
*Attorneys for Plaintiff Ricardo Jimenez*

By:_____
     Joshua D. Kelner (JK-3303)
7 World Trade Center, Suite 2700
New York, New York 10007
(212) 425-0700

## Appendix A

*People v. Aguilar*, 14 Misc.3d 1 (N.Y. Sup. Bronx 2006) (reversing conviction where prosecutor's summation "exceeded the bounds of legitimate advocacy")

*People v. Coppolo*, 30 A.D.3d 207 (1st Dept 2006) (conviction reversed where prosecutor engaged in "inexcusable" conduct in  violation of ruling)

*People v. Poventud*, 10 Misc.3d 337, 338 (N.Y. Sup. 2005) (conviction reversed due to *Brady* and *Rosario* violations)

*People v. Woods*, 9 A.D.2d 293 (1st Dept. 2004) (criticizing prosecutor for inviting complainant into her office during lunch break mid-testimony, where photographs of defendants were visible for her to see)

*People v. Spruill*, 5 A.D.3d 318 (1st Dept. 2004) (criticizing prosecutor for improper summation, but finding it harmless to result)

*People v. Laporte*, 306 A.D.2d 93 (1st Dept. 2003) ("We reverse because the prosecutor's remarks during summation so exceeded the limits of permissible comment that defendant was denied a fair trial")

*People v. Bruno*, Ind No. 0027/97, NYLJ, 4/23/03 (conviction reversed where prosecutor withheld information casting doubt on voluntariness of confession)

*People v. Johnson*, 2001 WL 1263380 (N.Y. Sup. 2001) (reversing conviction because of *Brady* and *Rosario* violations and holding that "society's commitment to treating defendants fairly compels the granting of the motion to vacate his conviction.")

*Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2000) (reversing conviction in case where "the prosecutor failed to provide the defense with a police officer's memo book containing a statement of a witness until after Flores's trial concluded" which constituted *Rosario* material)

*Mendez v. Artuz*, 202 F.3d 411 (2d Cir. 2002) (habeas petition granted due to *Brady* violation)

*Morales v. Portuondo*, 165 F.Supp.2d 601 (S.D.N.Y. 2001) (granting habeas petition and barring retrial, in part because People's handling of case was "troubling")

*People v. Olivero*, 272 A.D.2d 174 (1st Dept. 2000) (reversing conviction due to prosecutor's "manifestly unfair comment" in summation)

*People v. Ortega*, 241 A.D.2d 369 (1st Dept. 1997) (finding *Rosario* violation)

*People v. Mickel*, 274 A.D.2d 325 (1st Dept. 2000) (holding that the "non-disclosure of this *Brady* material warrants reversal" because there is "a reasonable possibility that this undisclosed *Brady* material would have resulted in a different verdict")

*People v. King*, 241 A.D.2d 239 (1st Dept. 1997) (reversing conviction due to *Rosario* violation)

*People v. Collins*, 173 Misc.2d 350 (N.Y. Sup. Bronx 1997) (finding *Brady* violation for failure to investigate and disclose information about witness)

*People v. Lantigua*, 228 A.D.2d 213 (1st Dept. 1996) (reversing conviction due to multiple forms of misconduct by prosecutor)

*People v. Hill*, 226 A.D.2d 309 (1st Dept. 1996) (conviction reversed where, among other things, "the prosecutor relentlessly pressed defendant to characterize the testimony of the People's witnesses as 'lies' and the witnesses themselves as 'liars'" resulting in denial of fair trial)

*People v. Palma*, 224 A.D.2d 363, 365 (1st Dept. 1996) (conviction reversed for *Rosario* violation)

*People v. Williams*, 212 A.D.2d 388 (1st Dept. 1995) ("persistent refusal of the prosecutor to obey the directives of the court and especially his contumacy in striving to utilize leading questions in order to introduce hearsay into the evidence, despite the directives of the court, call for a reversal of defendant's conviction")

*People v. Rutter*, 202 A.D.2d 123 (1st Dept. 1994) (reversing conviction, finding that People violated both *Brady* and *Rosario*), and related case, *People v. Bowen*, 234 A.D.2d 161 (1st Dept. 1996)

*People v. Ramos*, 201 A.D.2d 78 (1st Dept. 1994) (reversing conviction for *Brady* violations)

*People v. White*, 200 A.D.2d 351 (1st Dept. 1994) (reversing conviction for *Brady* and *Rosario* violations)

*People v. Slaughter*, 189 A.D.2d 157 (1st Dept. 1993) (reversing conviction and noting "various errors" by prosecutor, including improperly vouching for witness' credibility)

*People v. Banfield*, 194 A.D.2d 330 (1st Dept. 1993) ("certain statements by a member of the District Attorney's office to a prosecution witness indicating that a decision on his part to testify for the prosecution would be instrumental in their working out a 'favorable disposition' on pending charges constituted a promise which served as a *quid pro quo* for the witness' cooperation" and "the prosecution's failure to disclose the statements to the defense and its permitting the witness to testify that no promises were made was improper"), and related case, *People v. Byfield*, 194 A.D.2d 331 (1st Dept. 1993)

*People v. Mudd*, 184 A.D.2d 388 (1st Dept. 1992) (prosecutor's statement in summation was "is directly contradictory to the evidence, prejudicial and entirely outside the bounds of acceptable rhetorical comment")

*People v. Lewis*, 174 AD2d 294 (1st Dept. 1992) (reversing conviction where prosecutor failed to disclose understanding reached with another prosecutor in a different jurisdiction on a separate charge for witness' testimony then misled jury in summation that no promises had been made, noting "by not disclosing the agreement, the prosecutor was able to bolster Nelson's credibility in the summation without a substantive challenge from the defense")

*People v. Hernandez*, 185 A.D.2d 147 (1st Dept. 1992) (affirming conviction but noting, with regard to prosecutor's improper summation, that "we deplore such excesses in the strongest possible terms and ask that prosecutors be trained and admonished to refrain from such unnecessary conduct")

*People v. Butler*, 185 A.D.2d 141 (1st Dept. 1992) (prosecutor's summation was improper in numerous ways and violated his duties under the Code of Professional Responsibility)