```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
RICARDO JIMENEZ,

               Plaintiff,

          - against -

CITY OF NEW YORK, WENDELL STRADFORD,
KAREN SERRANO-PAGLIA, as Administrator
of the Estate of MICHAEL SERRANO,
CHRISTOPHER HORN, and BRONX COUNTY
DISTRICT ATTORNEY'S OFFICE,

               Defendants.

--------------------------------------X
```

**MEMORANDUM AND ORDER**

23 Civ. 06751 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ricardo Jimenez ("Jimenez") has brought this lawsuit, see ECF No. 1, asserting violations of 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") following a successful habeas petition, see Jimenez v. Graham, No. 11 Civ. 6468 (JPO), 2022 WL 2789217 (S.D.N.Y. July 15, 2022) ("Oetken Opinion -- Habeas"). Jimenez now seeks monetary damages against multiple defendants, including the City of New York, the Bronx County District Attorney's Office (the "Bronx DA's Office"), and three New York City Police Department Detectives[1] ("Dets.") for purported violations of Section 1983 and state negligence and malicious

---

[1]    The three detectives are: Wendell Stradford, Christopher Horn, and Michael Serrano.  Karen Serrano-Paglia is named as a defendant as Administrator of the Estate of Detective Serrano.

prosecution laws. Broadly described, Jimenez asserts that his second degree murder conviction arising from a 1989 fatal shooting resulted from police and prosecutorial wrongdoing, as well as systematic failures within the Bronx DA's Office. See ECF No. 35 ("Second Amended Complaint" or "SAC"). Defendants moved to dismiss for failure to state a claim. See ECF No. 45. For the following reasons, defendants' motion is granted, and Jimenez's Second Amended Complaint is dismissed with prejudice.

## A.   Factual Background[2]

### 1. The 1989 Murder and Initial Investigation

In July of 2007, a jury convicted Jimenez of murder in the second degree for shooting and killing Sean Worrell ("Worrell")

---

[2]      Unless otherwise noted, the facts considered and recited herein are drawn from Jimenez's Second Amended Complaint and are accepted as true for the purposes of the instant motion. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  However, any legal conclusions raised in plaintiff's complaint need not be accepted as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Additionally, we rely on the facts outlined in the various state and federal court opinions issued in Jimenez's case since 2006, which are incorporated by reference into the complaint given Jimenez's "reliance on the terms and effect" of such opinions. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  Also, on a motion to dismiss, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).

nearly two decades earlier at the Whitestone Movie Theatre in the Bronx.  See SAC ¶¶ 1-2, 26-29, 46.  Shortly after midnight on July 3, 1989, bystanders at the theatre observed two men, including the victim Worrell, in a verbal dispute in the concession line.  Id. ¶¶ 2, 46.  During the confrontation, "the shooter stated that he was going to get his gun and thereafter, was seen leaving the movie theater."  People v. Jimenez, No. 3825/2006, at *3 (Sup. Ct. Mar. 4, 2014) (Sackett, J.) ("Sackett -- § 440.10 Opinion").[3]  At that point, Worrell left the concession stand and entered a theatre playing the "Batman" movie.  Id.  After taking his seat, and as "the movie was about to begin, the shooter returned, entered the crowded Batman theater, and approached Mr. Worrell. . . . Words were exchanged between the parties, weapons were drawn and shots were fired."  Id.  Patrons scattered at the sound of the gunshots, and Worrell lay dead in the aisle from two gunshot wounds.  Id.

The NYPD began investigating, and the case was assigned to Dets. Serrano and Horn from the Bronx Detective Squad.  SAC ¶¶ 47-49.  Dets. Serrano and Horn took several witness statements.  Id. ¶¶ 51-53.  One witness reported to Det. Serrano that "[t]wo males, Black, were arguing about who was in line first [at the concession counter].  One guy said 'I'll come back and shoot your ass.' . .

---

[3]    This Decision and Order by Supreme Court Justice Robert A. Sackett is discussed at some length below.  See infra at 12-15.

-3-

. [T]hey had words in Rastafarian." <u>See</u> SAC, Ex. A ("DD-5") at RJ-000907. Another witness said she "overheard a verbal altercation between two males whom she described as sporting flat-top haircuts, and wearing a lot of gold." <u>Id.</u> at RJ-000093. This witness described the shooter as a "tall and thin" man "in his early twenties" who spoke with a "Jamaican accent[]." <u>Id.</u> Yet another witness reported that a "thin" young man, "about 6' tall, short cropped hair (black) with a thin blond streak of hair running along the side of his head" who wore "numerous rings on his fingers, [and] a large medallion . . . from a chain around his neck," argued with the victim in "the concession stand [while] waiting to be served." <u>Id.</u> at R-000094.

Esco Blaylock ("Blaylock"), another eyewitness, worked at the movie theatre at the time of the shooting. SAC ¶ 52. During an interview with Dets. Serrano and Horn, Blaylock described an argument that had broken out at the concession stand between Worrell and another man, who Blaylock identified as a black man named "Leon." <u>See</u> SAC, Ex. B ("DD-5") at R-000085. Blaylock stated that he had known "Leon" for "about 2 years" after having "met . . . through a friend." <u>Id.</u> Blaylock noted that he knew "Leon" to be a "violent guy and heavily involved in selling drugs." <u>Id.</u> Blaylock also described "Leon's" physical appearance to the

-4-

detectives, relaying that he was "about 5'10", 175 lbs., [with a] high-top haircut with shaved sides, and two blond streaks running along the side of his head," who "look[ed] Puerto Rican, and c[ould] mimic [sic] a Jamaican accent." <u>Id.</u> Blacklock further told the detectives that "Leon" had a girlfriend, who Dets. Serrano and Horn later identified as Sharon Ramroop.[4] <u>Id.</u> at R-000917.

The detectives interviewed Sharon Ramroop in the presence of her mother. <u>Id.</u> at R-000087. Ramroop said she knew "Leon" and similarly described him as a man of "Jamaican and Indian Extraction" and a "flashy dresser" with "a flat top haircut." <u>Id.</u>

Dets. Serrano and Horn conducted follow-up interviews with Blaylock and Ramroop in the police precinct about one week after the shooting. <u>See</u> SAC, Ex. D at RJ-002100. As the detectives' DD-5 report describes:

---

[4]    It should be noted that the account that Blaylock originally offered to Dets. Serrano and Horn, as memorialized in their DD-5 reports, <u>see</u> SAC, Exs. B-C, is consistent with Blaylock's 2006 testimony before the Grand Jury. In that testimony, Blaylock explained that, during his shift at the movie theatre, he was "talking with [his] girlfriend at the time an argument" broke out in the concession line between a man and "the perp, which was known to [him] as Leon." <u>See</u> Grand Jury Minutes ("G.J. Min.") at 4:13-5:4. Blaylock stated that the argument ended and the men parted ways. <u>Id.</u> at 5:5-7. Shortly thereafter, Blaylock, who had entered the theatre showing the Batman movie, noticed that "Leon" had returned and "was looking around . . . searching for something [in the theatre]. And he seen the guy [he argued with in the concession line]. Words were exchanged. And I heard two shots ring out. You know, I seen the flash from the gun and that's when I went outside along with the crowd." <u>Id.</u> at 5:5-6:21. Blaylock then described his 2006 meeting with Det. Stradford. <u>Id.</u> at 20:15-21:21. He stated that Det. Stradford asked several questions about the shooting before showing him a photo array, in which he "recognized the guy that I know as Leon, the guy that shot the other guy." <u>Id.</u> at 21:10-21.

> Both, Esco [Blaylock] and Sharon [Ramroop] viewed
> photos. Sharon Ramroop identified a photo as that of
> Mannel Jimenez, indicating that his brother as Ricky,
> the person being sought. A search of the files produced
> a photograph of Ricardo Jimenez. Mr. Esco Blaylock
> identified the photo of Ricardo Jimenez as the shooter
> in this case, and the person known to him as 'Leon.'
> Sharon Ramroop stated that she knew this individual as
> 'Ricky.'

Id.[5]

After linking the descriptions of the shooter to Ricardo Jimenez, the detectives arrested him in connection with Worrell's murder. SAC ¶ 62. However, Jimenez's detention was only temporary because Blaylock failed to appear for a follow-up lineup after he was "instructed by his employer at the Whitestone Theatre not to speak with the police about the Batman shooting and because his mother became scared and told Mr. Blaylock that she did not want him cooperating with the police." Sackett -- § 440.10 Opinion at *8 n.13. At that point, as there was insufficient evidence to hold Jimenez or pursue an indictment against him, Dets. Serrano and Horn released him. SAC ¶ 62. The case then went cold and would remain so for the next eleven years. Id. ¶¶ 63-64.

---

[5]    It should be noted that Ramroop, on October 26, 2012 -- twenty-three years after she identified a picture of Jimenez -- was approached at her home in East Dulwich, London, by an attorney from the Office of the Appellate Defenders ("OAD"). SAC, Ex. D. Before the OAD lawyer, she signed a statement indicating that she "would like to have nothing further to do with this matter" and that she "d[id] not know, and [has] never known, the person in th[e] photograph" of Jimenez that she was shown. Id.

## 2. The Cold Case is Revived

In or around the year 2000, Det. Wendell Stradford from the NYPD Cold Case Squad reopened the Worrell murder investigation. Id. ¶¶ 4, 64.  Det. Stradford studied the case intermittently over the next six years.  Id. ¶¶ 64-78.  He re-interviewed Blaylock, the eyewitness and movie theatre employee, and showed him "multiple photo arrays" of possible suspects.  Id. ¶¶ 65-67.  From the arrays, Blaylock identified Jimenez as the shooter, signed his name to the back of Jimenez's photo, and agreed to testify against him at trial.  Id.; see also Sackett -- § 440.10 Opinion at *10. Det. Stradford also interviewed Andrew O'Brien ("O'Brien"), a former associate of Worrell's, who was serving a 30-year sentence for an unrelated crime.  SAC ¶¶ 68-69.  O'Brien also implicated Jimenez as Worrell's murderer.  Id. ¶ 74.

Following Det. Stradford's investigation, Bronx County Assistant District Attorney Lisa Mattaway ("ADA Mattaway") was assigned to the Worrell case.  Id. ¶ 78.  ADA Mattaway met with O'Brien, who agreed to testify against Jimenez.  Id. ¶¶ 79, 86. ADA Mattaway "gave no . . . promise[s] to Mr. O'Brien other than the promise to write a letter on his behalf" in connection with his federal case.  See People v. Jimenez, No. 3825/2006, at *3 (Sup. Ct. June 29, 2018) (Torres, J.) ("Torres, J. -- Remand").

Ahead of O'Brien's testimony, ADA Mattaway contacted Assistant U.S. Attorney ("AUSA") David Novak on June 4, 2007, who had prosecuted O'Brien in the criminal case in Virginia for which he was serving a thirty-year sentence, and she requested copies of "any cooperation agreements [O'Brien] has made in exchange for his testimony with the Federal government and any information regarding favorable treatment he may have received in exchange for his cooperation."  SAC ¶ 82.

In response, AUSA Novak sent ADA Mattaway "three to four boxes of materials" related to O'Brien.  Sackett -- § 440.10 Opinion at *20.  Included therein was an FBI-302 report dated February 14, 1997, which contained notes from interviews with O'Brien conducted by FBI agents in connection with his guilty plea in the Eastern District of Virginia to a murder-related RICO charge.  See SAC, Ex. F ("O'Brien Proffer").  As recited in the FBI-302 Report, O'Brien was "interviewed regarding homicides which occurred in New York City" about which he "said he had hearsay knowledge."  Id. at RJ-001956.  Separately, O'Brien was shown a collection of photographs.  Id. at RJ-001974.  In one of those photographs, O'Brien identified Sean Worrell.  Id. at RJ-001976.  The 302 report states: "Sean Morrell, also known as 'Shaka' – O'Brien said this individual was killed in the Bronx, White Stone [sic] Movie

Theatre, and his mother lived on 45th Street in Brooklyn." <u>Id.</u>
In addition to the FBI report, AUSA Novak also provided to ADA
Mattaway: (1) letters O'Brien had sent to the judge in his case
seeking a sentencing reduction, describing himself as "desperate";
(2) the transcript of O'Brien's prior trial testimony against a
gang leader that led to a reduction in his sentence; and (3) an
AUSA's prior, successful motion to secure a sentencing reduction
for O'Brien.  SAC ¶ 83.  AUSA Novak noted that the materials were
provided for ADA Mattaway's "determination as to whether they are
discoverable in [the] prosecution of Ricardo Jimenez."  <u>See</u> SAC,
Ex. G ("Novak Email") at RJ-001915.

Jimenez was arrested as a suspect in Worrell's murder on
August 31, 2006.  SAC ¶ 87.  A few days later, on September 2,
2006, the grand jury, after hearing evidence presented by ADA
Mattaway, voted to indict Jimenez for Worrell's murder.  <u>See</u>
Sackett -- § 440.10 Opinion at *3.  Pending trial, Jimenez was
detained at Rikers Island, SAC ¶ 98, where, according to his
cellmate, Kevin Morrissey ("Morrissey"), he confessed to murdering
Worrell in the 1989 shooting, <u>id.</u> ¶ 99.  However, Jimenez disputes
this claim, <u>see</u> <u>id.</u> ¶ 101, and suggests that Morrisey was a
schizophrenic and a "serial jailhouse informant" with "a litany of
pending charges against him," <u>id.</u> ¶¶ 99-101.

Jimenez's case proceeded to trial, which began on June 20, 2007. See Sackett -- § 440.10 Opinion at *4. Over the course of three weeks, "[t]he jury heard testimony from approximately twelve prosecution witnesses." Id. However, Jimenez "did not testify and did not present any witnesses." Id. On July 13, 2007, after five days of deliberations, the jury found Jimenez guilty of second degree murder. Id.; see also SAC ¶¶ 7, 28. He was later sentenced to twenty-two years to life. SAC ¶ 29.

Jimenez served roughly fifteen years of that sentence before his conviction was vacated pursuant to Judge Oetken's habeas opinion, which found Brady violations by the prosecution. See Oetken Opinion -- Habeas at *3-13; see also infra at 23-25. Thereafter, the Bronx DA's Office opted not to retry him. SAC ¶¶ 39-40. Judge Oetken's habeas decision followed Jimenez's numerous, but unsuccessful, post-conviction challenges in state court, which are discussed in the following section.

**B.  Post-Conviction Challenges**

**1. Motion to Set Aside the Guilty Verdict**

Jimenez's first post-conviction effort was a 2007 motion to the trial court pursuant to New York Criminal Procedure Law ("NYCPL") § 330.30(2) to set aside the guilty verdict on the grounds of improper juror conduct. People v. Jimenez, 847 N.Y.S.2d

904 (Sup. Ct. 2007) (Torres, J.).   The motion was based on a juror's (Juror Ten) post-trial statement to defense counsel that some jurors had been disrespectful, intoxicated, and overbearing during deliberations.   Id.   The trial court rejected these allegations, noting that during trial, it conducted two in camera inquiries with Juror Ten and others, and that Juror Ten had repeatedly assured the court that she could "definitely" continue deliberating and reach a verdict.   Id.   The court also noted that Juror Ten confirmed her verdict when polled and did not speak out when the judge invited the jury to do so in an informal post-verdict meeting in the jury room.   Id.   Relying on the well-established principle that "a verdict may not be impeached by probes into the jury's deliberative process" absent "a showing of improper influence," the trial court found no "legal basis upon which to grant this motion" or a need to "conduct a hearing."   Id.

**2. Direct Appeal**

In 2010, Jimenez filed a direct appeal to the Appellate Division, see SAC ¶ 30, arguing that: (1) the verdict was against the weight of the evidence; (2) the trial court erred in refusing to charge a justification defense; (3) the prosecution engaged in a pattern of misconduct; (4) his speedy trial rights were violated; and (5) the sentence was excessive, see People v. Jimenez, 71

A.D.3d 483, 483–84, 896 N.Y.S.2d 69, 69–71 (1st Dept. 2010).  The four-judge panel rejected all of Jimenez's arguments and unanimously affirmed the verdict and sentence.  Specifically, the court concluded:

> The verdict was not against the weight of the evidence.
> There is no basis for disturbing the jury's
> determinations concerning credibility.  Two witnesses
> (one of whom was acquainted with defendant) having no
> connection with each other identified the same person
> and gave essentially similar accounts of the incident.
> Moreover, defendant's confession to an informant
> contained significant details that confirmed the
> informant's credibility.  The jury could have reasonably
> concluded that these factors outweighed the alleged
> deficiencies in the People's case.

Id. at 71 A.D.3d at 483, 896 N.Y.S.2d at 70 (internal citations omitted).[6]

Leave to appeal the decision was denied by a judge of the New York Court of Appeals.  People v. Jimenez, 15 N.Y.3d 752, 933 N.E.2d 223 (2010); see also SAC ¶ 30.

### 3. Motion Under N.Y.C.P.L. § 440.10 and Ensuing Appeal

i.    Jimenez's § 440.10 Motion

---

[6]    The Appellate Division also rejected claims of pre-indictment delay and challenges to the prosecutor's summation.  Id. at 71 A.D.3d at 484, 896 N.Y.S.2d at 71.  Also, it bears noting that the Appellate Division affirmed the trial court's decision not to charge justification, finding that Jimenez "did not preserve his argument that a justification charge was supported by a portion of his statement to the informant (a statement defendant claims to be the informant's fabrication), and we decline to review it in the interest of justice."  Id. at 71 A.D.3d at 484, 896 N.Y.S.2d at 70.

The following year, on September 23, 2011, Jimenez, represented by the Office of the Appellate Defender, filed a motion pursuant to NYCPL § 440.10 (1)(g) and (h) in the Supreme Court, Bronx County. See SAC ¶ 31. Jimenez raised several claims: (1) actual innocence; (2) insufficiency of trial evidence; (3) Brady violations; (4) pre-indictment delay; and (5) ineffective assistance by trial counsel.

In a detailed forty-four-page Decision and Order,[7] Supreme Court Justice Robert A. Sackett, clearly having reviewed the trial transcript and prior proceedings, and having considered over 1,600 pages of submissions, rejected all of Jimenez's claims. See Sackett -- § 440.10 Opinion at *1 n.2, *43-44.

Briefly stated, the court denied the actual innocence and insufficiency of the evidence claims on the merits. Id. at *12-15.[8] As for pre-indictment delay, the court noted that there is no statute of limitations for murder. Id. at *37-38. With respect to ineffective assistance of counsel, the court devoted eight pages

---

[7] This Decision and Order is included as an exhibit to Jimenez's second amended habeas petition, filed on April 24, 2019, before Judge Oetken. See Jimenez v. Graham, No. 11 Civ. 6468 at ECF No. 37-5, pgs. 1-44.

[8] The Appellate Division had previously rejected these claims in Jimenez's direct appeal in finding that the verdict was not against the weight of the evidence. See supra at 11-12.

of the opinion to a point-by-point review of Jimenez's arguments before ultimately rejecting the claim.  Id. at *35-43.

As Justice Sackett addressed the same Brady issues that underlie Jimenez's instant § 1983 complaint, we will describe Justice Sackett's rulings in some detail.  After a lengthy recitation of the requirements of Brady, see id. at *15-17, Justice Sackett addressed the defendant's specific Brady arguments, see id. at *17-34.

First, Justice Sackett discussed the failure of ADA Mattaway to disclose the transcripts of O'Brien's trial testimony against members of the Poison Clan gang in federal court in Virginia, see id. at *19-25, finding that the transcript information was "collateral to the defendant's case and provided solely additional impeachment material of the testifying witness."  Id. at *22.

Next, Justice Sackett held that additional disclosure of the criminal conviction records of O'Brien and Morrissey would only have provided "additional impeachment fodder" but would not "have produced a different result in the verdict," id. at *12, or, stated in Brady parlance, additional disclosures of the witness's criminal records were not "material to the question of defendant's guilt," id. at *17-18.  Justice Sackett noted that O'Brien's undisclosed crimes, namely, a 1992 conviction for Criminal

-14-

Possession of a Weapon, for which he received a sentence of three-
and-a-half to seven years, and a 1989 conviction for brandishing
a weapon, were similar to the disclosed crimes of violence and
murder.  Id. at *23.  Justice Sackett also found that these non-
disclosures were "inadvertent" and would not have "altered the
outcome of the defendant's trial nor den[ied] him due process," as
they "can hardly be considered [] highly material" to Jimenez's
guilt.  Id. at *24.  Similarly, with respect to the potential Brady
issues around Morrissey's undisclosed criminal history, Justice
Sackett observed that the criminal history that was disclosed for
Morrissey consisted of crimes of dishonesty, deceit and fraud,
which were similar in nature to the undisclosed crimes.  Id. at
*26-28.  Consequently, Justice Sackett found that "there was no
'reasonable probability' that disclosure of the additional
criminal records of Andrew O'Brien and Kevin Morrissey would have
changed the outcome of the defendant's trial."  Id. at *27-28.

      As for the argument that the prosecution failed to disclose
the cooperation benefits that O'Brien and Morrissey would have
received, Justice Sackett found:

      As the prosecutor clearly met her Brady obligation with
      regard to disclosure of the complete agreements made
      between her office and O'Brien and Morrissey for their
      testimony against the defendant, this Court finds no
      Brady violation under this issue.

Id. at *34.

In addition to Justice Sackett's rejection of all the Brady arguments, it is also significant that he found that the disclosure failures: "do[] not appear to be willful," id. at *18, and were "inadvertent" rather than "intentional," id. at *24.

ii.  Jimenez's Appeal of the § 440.10 Motion

Jimenez appealed Justice Sackett's decision, and on July 21, 2016, a four-judge appellate panel (one judge concurring in result only) substantially affirmed Justice Sackett's opinion, remanding a single one potential Brady issue for a hearing.  People v. Jimenez, 142 A.D.3d 149, 164, 37 N.Y.S.3d 225, 236 (1st Dept. 2016) ("Appeal of Sackett's § 440.10 Opinion").

The Appellate Division first reviewed Jimenez's actual innocence argument, which was based on "the statements of [Maxine Littlejohn and Dean Beckford] who claimed to have been in the movie theater on the night Worrell was killed but who did not testify," and who later told "an investigator hired by appellate counsel that the person . . . whose photograph they were shown [Jimenez], was not th[e] man" who shot Worrell.  Id. at 142 A.D.3d at 153, 37 N.Y.S.3d at 229.  In response, the First Department concluded: "Quite simply, this evidence [is] insufficient to warrant a hearing on actual innocence," because the purported exculpating statement

from Littlejohn was "patent hearsay," and the "Beckford statement
[was] unsworn." Id. at 142 A.D.3d at 156, 37 N.Y.S.3d at 231.
The court further noted that even if Littlejohn and Beckford's
statements were admissible, there was nothing "inherently reliable
about either," as they "were given many years after the shooting,
contain[ed] a lack of detail tending to explain why their
recollections can be considered accurate, and were made at the
specific behest of an agent for defendant." Id. at 142 A.D.3d at
157, 37 N.Y.S.3d at 231. The Appellate Division's opinion also
referenced Justice Sackett's finding that the proffered witness
statements "did not 'deviate from the description provided by all
of the eyewitnesses to the argument and the shooting: that the
shooter spoke with a Jamaican accent and had brown skin.'" Id. at
142 A.D.3d at 154, 37 N.Y.S.3d at 229 (quoting Sackett -- § 440.10
at *14). Thus, the court concluded that these statements were
insufficient to warrant a hearing and failed to "negate the
competing evidence that a jury has already heard, weighed, and
relied on to convict defendant." Appeal of Sackett's § 440.10
Opinion at 142 A.D.3d at 157, 37 N.Y.S.3d at 231.[9]

---

[9]    In this regard, after proffers from the prosecutor about additional
witnesses it could call, the Appellate Division observed that "for each new
witness who defendant claims can unequivocally establish his innocence, there
is another who can raise serious doubt about it, to say nothing of witnesses
who actually testified at trial." Id. at 142 A.D.3d at 158, 37 N.Y.S.3d at
232.

Apart from Jimenez's reliance on these two statements, he also questioned the credibility of some trial witnesses. The court found this argument insufficient to "warrant a hearing on actual innocence," id. at 142 A.D.3d at 158, 37 N.Y.S.3d at 232, emphasizing:

> Many criminal trials feature witnesses whose credibility is challenged and procedures such as identification that are less than perfect. However, we give great deference to the jury's ability to resolve these issues. Were we to recognize a stand-alone actual innocence claim, a hearing would be warranted only where the proffered evidence, accepted as true, raised serious doubt about the defendant's guilt.

Id. The court found no basis for such "serious doubt."

The court then turned to the Brady issues. With respect to the non-disclosures related to Morrissey's criminal record, the court found that the disclosed information and Morrissey's own admissions sufficiently showed that he was a "con artist" and that his "untrustworthiness" was "evident and undisputed." Id. at 142 A.D.3d at 159, 37 N.Y.S.3d at 233. Thus, the additional information was "cumulative" and would not "have changed the outcome." Id. As for information about Morrissey's mental status, the court found that defense counsel had "independent access to the impeachment material." Id. at 142 A.D.3d at 160, 37 N.Y.S.3d at 233.

Focusing on O'Brien, the court found that disclosure of the transcripts from O'Brien's testimony during his federal trial in Virginia and of his additional convictions "would merely have been cumulative, and as such, cannot be considered material for purposes of finding a Brady violation." Id. at 142 A.D.3d at 161, 37 N.Y.S.3d at 234. Finally, we quote fully from the Appellate Division's decision with respect to an undisclosed report from O'Brien's proffer sessions with the FBI, which was central to Judge Oetken's Brady holding:

> Defendant also complains that he was not provided with an FBI report, prepared after O'Brien was interviewed by New York City and federal law enforcement personnel about the many crimes he was involved in and many of which he had knowledge. The report contains a highly detailed recounting of the facts surrounding many of those crimes. However, it has a mere three lines about Worrell's murder, stating only: 'O'Brien said this individual was killed in the Bronx, White Stone Movie Theatre, and his mother lived on 45th Street in Brooklyn.' Defendant contends that the report could reflect the fact that O'Brien was not forthcoming about the murder of Worrell because he knew far less about it than he let on at defendant's trial.
>
> We agree with the motion court that none of these materials, had they been available to the defense before the trial, had a reasonable possibility of changing the outcome. The FBI report that defendant asserts contained a suspiciously cursory description of Worrell's murder is not material. The report was primarily about O'Brien's involvement in gang activity and the people who traveled in the same orbit with him. At one point in the interview he was asked to identify photographs of approximately 40 of those people. One of them was Worrell, and O'Brien gave the same short

description of him as he gave for each of the other people.  There is no indication that it would have been appropriate, in the context of the interview, for O'Brien to describe Worrell's murder in detail or to offer that he had witnessed it.

Defense counsel's cross-examination of O'Brien amply elicited the unsavory elements of his character, manifested by his racketeering conviction, which, by his own admission at trial, involved a conspiracy to distribute narcotics, a conspiracy perpetuated by murder where necessary.  Further, the cross-examination revealed O'Brien's convictions, shortly before Worrell's murder, for weapons and drug possession.  Any further impeachment material would merely have been cumulative, and as such, cannot be considered material for purposes of finding a <u>Brady</u> violation.

<u>Id.</u> at 142 A.D.3d at 160–61, 37 N.Y.S.3d at 233–34.

Furthermore, the court addressed Jimenez's contention that Justice Sackett had "failed to analyze his <u>Brady</u> claims on a collective basis."  <u>Id.</u> at 142 A.D.3d at 161, 37 N.Y.S.3d at 234. While agreeing that was the appropriate standard, the Appellate Division concluded: "[W]e do not lack confidence that the trial's outcome would have been the same had the material, viewed collectively, been produced."[10]  <u>Id.</u>

There was, however, one <u>Brady</u> issue that the court concluded required further exploration, which was whether the failure of the prosecution to disclose materials relating to O'Brien, namely, (i)

---

[10]    The Appellate Division briefly addressed and rejected other <u>Brady</u> issues, which have played no role in this § 1983 case.

his plea agreement with federal prosecutors obligating him to cooperate; (ii) letters he sent to a federal judge seeking a sentence reduction; and (iii) an email from AUSA Novak to ADA Mattaway, was sufficient to require a hearing to determine whether ADA Mattaway knew that O'Brien was expecting a sentence reduction for his testimony in this case. Id. at 142 A.D.3d at 161–62, 37 N.Y.S.3d at 234–35. Determining that the existence of an undisclosed quid pro quo could have had a material impact on the jury, the Appellate Division remanded this singular issue for a hearing. Id. at 142 A.D.3d at 161–62, 164, 37 N.Y.S.3d at 234–36.

### iii. Remanded Brady Issue

On remand, the trial judge held a hearing at which he heard testimony from ADA Mattaway, Det. Stradford, and O'Brien, and received the testimony of former AUSA David Novak by stipulation. In a Decision and Order dated June 29, 2018,[11] Justice Torres found that the three live witnesses testified credibly and that their testimony "clearly establishes that there was no quid pro quo

---

[11]    This Decision and Order is included as an exhibit to Jimenez's second amended habeas petition, filed on April 24, 2019, before Judge Oetken. See Jimenez v. Graham, No. 11 Civ. 6468 at ECF No. 37-3, pgs. 1-4.

agreement."    Torres, J. -- Remand at *3-4.    Moreover, Justice
Torres continued:

> I find no evidence of any agreement of any kind other
> than what the parties disclosed at trial and testified
> to before this Court at the hearing.    There is no
> evidence before this Court to support the defendant's
> contention that there was any other agreement made
> between ADA Mattaway and Andrew O'Brien.    I also find no
> evidence to support that there was any relationship
> between Det. Stradford and Mr. O'Brien or Det. Stradford
> and ADA Mattaway concerning any other agreement.
> Therefore, the Court finds there was no <u>quid</u> <u>pro</u> <u>quo</u>
> agreement between the Bronx prosecutor's office and Mr.
> O'Brien and/or the federal prosecutor.    The Court
> further finds no <u>Brady</u> violation concerning the
> understanding between the Bronx prosecutor and Mr.
> O'Brien and/or the federal prosecutor.

<u>Id.</u> at *4.

Following Justice Torres's decision, Jimenez filed a motion
for re-argument, which was denied.[12]    <u>People v. Jimenez</u>, No.
3825/2006, at *4 (Sup. Ct. August 26, 2019) (Torres, J.).    In
denying re-argument, it is notable that Justice Torres reiterated
his finding that AUSA Mattaway "testified credibly" and that
throughout the trial, she had no knowledge of any agreement or
arrangement between O'Brien and AUSA Novak.    <u>Id.</u> at *3.

---

[12]    This Decision and Order is included as an exhibit to Jimenez's second
amended habeas petition, filed on December 5, 2019, before Judge Oetken.    <u>See</u>
<u>Jimenez v. Graham</u>, No. 11 Civ. 6468 at ECF No. 56-1.

Leave to appeal the denial of re-argument to the Appellate Division was denied, see People v. Jimenez, 2018 N.Y. Slip. Op. 87587(U) (1st Dep't 2018), as was leave to appeal to the New York Court of Appeals, see People v. Jimenez, 2019 N.Y. Slip Op. 66214(U) (1st Dep't 2019).

**4. Jimenez's Habeas Corpus Petition**

On September 9, 2011, Jimenez filed a petition for a writ of habeas corpus in federal court, which was stayed by Judge Oetken of this Court pending the outcome of Jimenez's state post-conviction proceedings. Jimenez v. Graham, No. 11 Civ. 6468 (JPO), 2011 WL 6287999, at *6 (S.D.N.Y. Dec. 14, 2011). Following the lifting of the stay, Judge Oetken granted Jimenez's petition on Brady grounds without addressing the other issues Jimenez raised about his prosecution and conviction. See Oetken Opinion -- Habeas at *13. Judge Oetken's opinion is lengthy, but his Brady findings are limited to the non-disclosures related to O'Brien.

To begin, Judge Oetken held that he could not "conclude that it was objectively unreasonable for the hearing court [Justice Torres on remand] to determine that there was no quid pro quo agreement in place." Id. at *6. However, Judge Oetken rejected the hearing court's second holding that there was "'no Brady violation concerning the understanding between the Bronx

-23-

prosecutor and Mr. O'Brien,'" finding that it "was an unreasonable application of <u>Brady</u>."   <u>Id.</u>   (internal citation omitted). Specifically, Judge Oetken found that the disclosure that O'Brien was "currently jailed in Federal Custody for Murder (unrelated) and serving 30 years," and that he had "asked for a letter to be prepared by the undersigned [ADA Mattaway] that he can put in his file stating that he testified for the Bronx District Attorney's Office," was insufficient for <u>Brady</u> purposes. <u>Id.</u> at *7. This finding was based on the "prosecution's failure to disclose everything it knew about O'Brien's potential use of the letter, including the fact that he had cooperated in a federal case, had received a Rule 35 order reducing his sentence, had continued to seek a sentence reduction, and that the letter would be sent to the AUSA who had previously filed a Rule 35 motion on his behalf." <u>Id.</u>

Judge Oetken further determined that the failure to produce to the defense a 1997 FBI report that recorded a lengthy interview with O'Brien constituted a second <u>Brady</u> violation.  <u>See id.</u> at *9– 11.  This finding specifically rejected the unanimous holding of the Appellate Division, quoted <u>supra</u> at 18-21, which found the non-disclosure "not material" in the context of <u>Brady</u>.

In light of these <u>Brady</u> findings, Judge Oetken ordered Jimenez
to be released unless he was provided a new trial within 120 days.
<u>Id.</u> at *13; <u>see</u> <u>also</u> SAC ¶ 38.  On April 10, 2023, the Bronx DA's
Office opted to dismiss the indictment and not retry Jimenez, who
had already served about fifteen years of his twenty-two years to
life sentence for the Worrell murder, which, at that point, had
occurred nearly thirty-five years earlier.  SAC ¶¶ 39-40.  In the
wake of this successful habeas petition, Jimenez filed the Section
1983 action currently before us.[13]

## **<u>LEGAL STANDARD</u>**

On a motion to dismiss under Rule 12(b)(6), the Court must
accept as true the complaint's factual allegations, as well as
those facts incorporated by reference into the complaint, and draw
all reasonable inferences in the plaintiff's favor.  <u>Kassner v.
2nd Ave. Delicatessen Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007); <u>see
also</u> <u>Johnson v. JPMorgan Chase Bank</u>, N.A., 488 F. Supp. 3d 144,
161 n.29 (S.D.N.Y. 2020) ("In deciding a motion to dismiss, the
Court can consider documents incorporated by reference in the

---

[13]     Jimenez filed this action on August 2, 2023.  <u>See</u> ECF No. 1. Defendants
sought leave to dismiss on December 8, 2023, <u>see</u> ECF No. 28, but before any
motion could be made, Jimenez filed a first Amended Complaint on January 10,
2024, <u>see</u> ECF No. 32, and a Second Amended Complaint on January 22, 2024, <u>see</u>
ECF No. 35.  On March 1, 2024, defendants moved to dismiss the Second Amended
Complaint.  <u>See</u> ECF No. 45.  That motion was fully briefed on April 19, 2024.
<u>See</u> ECF Nos. 46, 49, 51.

complaint."). Those "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). "Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Ultimately, unless a plaintiff alleges "enough facts to state a claim to relief that is plausible on its face," the "complaint must be dismissed." Twombly, 550 U.S. at 570.

## DISCUSSION

The ensuing discussion addresses, on a defendant-by-defendant basis, Jimenez's claims of malicious prosecution, denial of fair trial rights, and failure to intervene, followed by the issues of municipal liability under § 1983 and Monell v. Dep't of Social Services, 436 U.S. 658 (1978), and common law negligence.

### A. Detectives Serrano and Horn

Jimenez brings three claims against Dets. Serrano and Horn, the detectives initially assigned to the Worrell murder but whose investigation concluded without any charges being brought. Jimenez's claims against these detectives include malicious

-26-

prosecution, see SAC ¶¶ 123-34, denial of fair trial rights, see id. ¶¶ 135-46, and a failure to intervene, see id. ¶¶ 147-56.  As explained below, these claims fail for two key reasons: (1) first, Jimenez is unable to link the issues he perceives in Dets. Serrano and Horn's 1989 investigation to the legal proceeding brought against him nearly two decades later; and (2) second, there are no particularized facts to support Jimenez's claims, which, as pled, are, in essence, mere recitations of the elements of the causes of action.  We address each claim in turn.

**1. Malicious Prosecution**

To state a claim for malicious prosecution under § 1983, a plaintiff must "show a violation of his rights under the Fourth Amendment . . . and [then] establish the elements of a malicious prosecution claim under state law."  Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010).[14]  In New York, these elements include: "1) the initiation or continuation of a criminal proceeding against plaintiff; 2) termination of the proceeding in plaintiff's favor; 3) the lack of probable cause for commencing the proceeding; and 4) actual malice as a motivation for defendant's actions."  Id.  To succeed on such a claim, a plaintiff

---

[14]    Jimenez also brings a malicious prosecution claim under New York law, but since the § 1983 standard embodies the requisite state standard, we need not analyze his state claim separately.  See id.

must clear "a high bar," Frederick v. New York City, No. 11 Civ. 469 (JPO), 2012 WL 4947806, at *9 (S.D.N.Y. Oct. 11, 2012), when, as here, he bears the "burden of rebutting the presumption of probable cause" that attaches upon a grand jury indictment, Rothstein v. Carriere, 373 F.3d 275, 284 (2d Cir. 2004). To satisfy this burden, a plaintiff must present evidence of grand jury misconduct or "fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith," id., that erodes the "premise that the Grand Jury acts judicially," Colon v. City of New York, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248, 1250 (1983). Even if a plaintiff meets this burden, he must still establish that the prosecution was brought with malicious intent, which equates to "'a wrong or improper motive, something other than a desire to see the ends of justice served.'" Watson v. Cieslak, 09 Civ. 2073 (DAB)(JCF), 2011 WL 446276, *8 (S.D.N.Y. Jan. 5, 2011) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 445 (1978).

Jimenez's claim fails at the outset, as the actions of Dets. Serrano and Horn -- whose investigation stopped seventeen years before Jimenez was indicted for Worrell's murder -- indisputably did not lead to "the initiation or continuation of a criminal proceeding" against Jimenez. Manganiello, 612 F.3d at 161.

Indeed, the opposite is the case: in 1989, after Blaylock failed to appear for a lineup to identify Jimenez as the shooter -- due to fear over losing his job and endangering his family, see supra at 6 -- Jimenez was released from police detention, see SAC ¶ 62. No criminal process ensued, and the case went cold for over a decade. Id. ¶¶ 63-64.

By the time the case was revived around 2000, Det. Stradford, not Dets. Horn or Serrano, who had "retired by the time of trial," see Appeal of Sackett's § 440.10 Opinion at A.D.3d at 152, 37 N.Y.S.3d at 228, had "assumed responsibility for the Worrell case," SAC ¶ 64. And, based on the record, it does not appear that either Det. Serrano[15] or Horn was involved in this second investigation. Thus, the actions of Dets. Serrano and Horn in 1989 lack the necessary throughline to Jimenez's 2006 prosecution, and as such, neither detective can be liable for malicious prosecution.

While the absence of such a causal link is sufficient to dismiss the malicious prosecution claim against Dets. Serrano and Horn, Jimenez's malicious prosecution claim fails for two other independent reasons. First, as will be discussed further, Jimenez has not rebutted -- as it is his burden to do -- the strong

---

[15]    Det. Serrano testified at trial, but his testimony was limited to the investigation in 1989. See Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 153, 37 N.Y.S.3d at 228.

presumption of probable cause which follows from a grand jury indictment.  Rothstein, 373 F.3d at 284.  Second, while the complaint's references to Dets. Serrano and Horn's alleged fabrication, actual malice, etc. are dramatic, SAC ¶¶ 123-34, these serious allegations are advanced without support in the record. The deference to a complaint on a motion to dismiss only applies to supportable factual allegations, not bald legal assertions. Iqbal, 556 U.S. at 678.

One example of the lack of support for Jimenez's bald allegations is the assertion that "[a]fter a highly suggestive 'single photo' identification procedure, Blaylock purportedly identified Jimenez as the shooter."  SAC ¶ 57.  While a review of the DD-5s calls into serious question whether Blaylock was shown only a single photo for identification purposes, such a claim, even if true, would fail as a matter of law because a single photo identification is not unlawful when there is an independent basis for the identification.  See, e.g., Layton v. Phillips, 340 F. App'x 687, 689 (2d Cir. 2009) (highlighting that single photographic identification procedures are appropriate so long as they are not "'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'") (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  That

independent basis may derive from the witness's past relationship with the defendant or from the witness's observation of the crime.[16] See, e.g., Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (finding that a "single-photograph display[]," when administered to an eyewitness without "coercive pressure," was permissible, as it did not create "a very substantial likelihood of irreparable misidentification") (internal marks and citation omitted); United States v. Jimenez, No. 20 Crim. 122 (LTS), 2020 WL 7231062, at *2 (S.D.N.Y. Dec. 8, 2020) ("[C]ourts in this circuit have held that identification procedures consisting of the display of a single photograph to a witness who states that the witness already knows the perpetrator, in order to confirm the perpetrator's identity, are not unduly suggestive."); United States v. Hardy, No. 10 Cr. 1123 (JSR), 2011 WL 7782582 (S.D.N.Y. Jan. 25, 2011) (finding that the Government's display of "a confirmatory photograph of a person the witness has indicated that he already knows" was "perfectly acceptable" and not "unduly suggestive"). Here, Blaylock stated from the outset that he had known Jimenez for "about 2 years," see DD-5 at R-000085, and that he directly witnessed the crime, SAC ¶

---

[16]    It is also worth highlighting that under New York law, a "confirmatory identification" from a single photograph does not implicate due process concerns. People v. Rodriguez, 79 N.Y.2d 445, 593 N.E.2d 268 (1992). Indeed, the single photograph method can be "confidently applied where," as here, "the protagonists are . . . friends or acquaintances." Id. at 79 N.Y.2d at 450, 593 N.E.2d at 272.

52.[17]  Either of these facts would be sufficient to rebut any claim of an impermissibly suggestive, single-photo identification of Jimenez, and by extension, any claim of malicious prosecution.

### 2. Fair Trial Claim

Jimenez also asserts a fair trial claim against Dets. Serrano and Horn predicated on an unsubstantiated fabrication of evidence allegation concerning Blaylock's identification.  Id. ¶¶ 135–46. To prevail on such a claim, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) of a material nature that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016).  Jimenez's allegations, no doubt deliberately, leave out the fact that seventeen years after the initial interviews by Dets. Serrano and Horn, Blaylock testified under oath before the grand jury and identified Jimenez as the shooter.  See G.J. Min. at 18:5–7, 22:19–21 ("I have seen him around the neighborhood and . . . I didn't know him personally[,] but I knew of him. I knew of him as Leon. . . . I recognized his face.  I have one [sic] question about

---

[17]    Moreover, Blaylock notably did not withdraw his identification of Jimenez while under oath before the grand jury and at trial.  See infra at 32–33.

it.  I am a good judge, I recognized him instantly.  I said this is the guy.").  Again under oath, Blaylock testified at trial, where he was also cross-examined by defense counsel who could utilize the DD-5's to challenge Blaylock's initial statements to Dets. Serrano and Horn.  See Sackett -- § 440.10 Opinion at *41. Significantly, Jimenez does not allege -- nor could he -- that Blaylock ever recanted his identification of Jimenez or his sworn testimony before the grand jury or at trial.[18]

As with the malicious prosecution claim, there is no throughline between Dets. Serrano and Horn's investigative work and the eventual prosecution of Jimenez seventeen years later.  It is undisputed that Dets. Serrano and Horn's investigation of Worrell's murder ended (i) without any charges being brought against Jimenez or anyone else,[19] and (ii) without any evidence in

---

[18]    In Jimenez's efforts to undermine the series of consistent identifications made by Blaylock over many years, Jimenez attached to his complaint an affidavit, dated April 23, 2012, from a "private investigator" hired on Jimenez's behalf.  See SAC, Ex. E.  Even apart from the fact that this affidavit clearly constitutes inadmissible hearsay, it notably does not contain a recantation of Blaylock's identification.  Moreover, while this Court has no independent capacity to learn what documents were presented to Justice Sackett, this affidavit, bearing the date of April 23, 2012, was available to file in connection with Jimenez's § 440.10 motion and yet it is not mentioned in either Justice Sackett's decision or in the appeal therefrom.  Sackett -- § 440.10 Opinion at *1-44; Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 149-64, 164, 37 N.Y.S.3d at 225-36; see also infra at 43 n.24.

[19]    Given that no prosecution resulted during the time that Dets. Serrano and Horn were assigned to the investigation, there is no basis for an assertion of a Brady claim against the detectives, assuming that the Second Amended Complaint tries to assert one.

the record indicating that Dets. Serrano or Horn had any communication with the Bronx DA's Office about initiating a prosecution years later.  In short, these basic elements of a fair trial claim have not been met, and the claim must therefore be dismissed.

Even assuming, _arguendo_, that Dets. Serrano and Horn's investigation had resulted in a criminal proceeding against Jimenez, his fabrication-based fair trial claim would still fail. In general, fabrication-based fair trial claims under § 1983 address situations in which "a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty." Bailey v. City of New York, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015).  "[M]anufactured" evidence is typically planted evidence, forced testimony, or falsified police reports.  See e.g., Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 126 (2d Cir. 1997) (involving allegations that an officer invented a suspect's written confession); Barnes v. City of New York, 68 F.4th 123, 129 (2d Cir. 2023) (involving officers lying to prosecutors in relaying that they witnessed the defendant sell drugs); Shabazz v. Kailer, 201 F. Supp. 3d 386, 391 (S.D.N.Y. 2016) (involving officers who allegedly fabricated photographs linking suspect to a handgun).

In this case, Jimenez does not advance any wrongdoing consistent with the type of facts covered by a fabrication-based fair trial claim.  Rather, Jimenez largely distorts Dets. Serrano and Horn's standard investigative procedures, characterizing them as fabrication.  Further, it is noteworthy that Blaylock is not the object or subject of any <u>Brady</u> claim addressed by either Justice Sackett's opinion on Jimenez's § 440.10 petition in state court or Judge Oetken's habeas opinion in this Court.  <u>See</u> <u>supra</u> at 12-16, 23-25.  At bottom, Jimenez offers no proof that evidence against him was manufactured, nor are there any particularized facts suggesting that Dets. Serrano or Horn planted, mishandled, or otherwise invented evidence implicating Jimenez.  For these reasons, Jimenez's fair trial claim must be dismissed.

### 3. Failure to Intervene

Jimenez's third claim against Dets. Serrano and Horn is a vague, scattered failure to intervene claim.  SAC ¶¶ 147-56.  On a failure to intervene claim, an "officer can be held liable under Section 1983 for 'the preventable harm caused by the actions of the other officers if that officer observes or has reason to know that (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official.'"  <u>Kayo v. Mertz</u>, 19

Civ. 365 (PAE), 2021 WL 1226869, at *16 (S.D.N.Y. 2021) (quoting
Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).
Specifically, with respect to the third element, "'[a] police
officer cannot be held liable for failure to intervene unless such
a failure permitted fellow officers to 'violate a suspect's clearly
established statutory or constitutional rights' and was under
circumstances making it objectively unreasonable for him to
believe that his fellow officers' conduct did not violate those
rights." Jackson v. Tellado, 236 F. Supp. 3d 636, 655 (E.D.N.Y.
2017) (quoting Morris v. City of New York, No. 14 Civ. 1749 (JG)
(LB), 2015 WL 1914906, at *6 (E.D.N.Y. Apr. 27, 2015)).

        Significantly, only those who are the direct objects of a
failed intervention have standing to bring such a claim. See
Martinez v. City of New York, 564 F. Supp. 3d 88, 106 (E.D.N.Y.
2021) ("[A] plaintiff must demonstrate that the officer's failure
to intervene 'permitted fellow officers to violate' the
plaintiff's 'clearly established statutory or constitutional
rights,'") (quoting Ricciuti, 124 F.3d at 129) (emphasis added).
According to the arguments presented, the only individuals with
whom Dets. Serrano and Horn are alleged to have interacted in this
context are Blaylock and Ramroop, yet there is no claim of
excessive force, wrongful arrest, or other constitutional right

impairment as to either of them.  Moreover, to the extent Jimenez attempts to assert a derivative failure to intervene claim based on a "coercive interrogation" as to Ramroop, it would fail for the additional reason that Ramroop's responses to the detectives' questioning played no role in Jimenez's indictment or trial, as Ramroop, who was not an eyewitness, never testified.[20]  Sackett -- § 440.10 Opinion at *39.  And, as noted earlier, see supra at 32-33, Blaylock swore before the grand jury and at trial to his positive identification of Jimenez, an identification he has never recanted in over thirty-five years.

It is also telling that none of the appellate reviews of Jimenez's prosecution contain any suggestion that Dets. Serrano or Horn engaged in any unconstitutional practice, let alone failed to intervene in any such situation.  See supra at 10-25.  Thus, since "there is no underlying constitutional violation," Jimenez "cannot succeed on a claim for failure to intervene under § 1983."  Kayo, 2021 WL 1226869, at *16.

To summarize, Jimenez's claims against Dets. Serrano and Horn fail for numerous, independent reasons, including, but not limited to, (i) a lack of a causal throughline, (ii) a failure to rebut

---

[20]   For completeness, we note that there is no suggestion in the record that Det. Stradford ever had any interaction with Ramroop.

the probable cause presumption from the grand jury's indictment, and (iii) an absence of specific factual predicates for the asserted claims.  We thus dismiss Jimenez's claims against Dets. Serrano and Horn with prejudice.

## B. Jimenez's Claims as to Detective Stradford

Jimenez also asserts the same three § 1983 claims against Det. Stradford: malicious prosecution, see SAC ¶¶ 123–34, denial of fair trial rights, see id. ¶¶ 135–46, and failure to intervene, see id. ¶¶ 147–56.  Again, we address each in turn.

### 1. Malicious Prosecution[21]

As discussed above, a malicious prosecution claim has four elements, see supra at 27, one of which requires a plaintiff to overcome the presumption of probable cause that attaches upon a grand jury indictment.  See Rothstein, 373 F.3d at 284.  To defeat that presumption, there must be evidence of grand jury impropriety or "fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith."  Id.  As highlighted earlier, rebutting the probable cause presumption is a "high bar" to clear, Frederick, 2012 WL 4947806, at *27, as it requires "a finding of

---

[21]    As discussed earlier, see supra at 27 n.14, we recognize that Jimenez asserts malicious prosecution claims under both § 1983 and state law, but since a § 1983 malicious prosecution claim's elements encompass the elements of a state law malicious prosecution claim, we do not discuss them as separate causes of action.

[grand jury] misconduct sufficient to erode the 'premise that the [g]rand [j]ury acts judicially [,]'" <u>Rothstein</u>, 373 F.3d at 284 (quoting <u>Colon</u>, 468 N.Y.S.2d at 455, 455 N.E.2d at 1248).

Jimenez fails to clear this "high bar," for the record is devoid of evidence showing any defect in the grand jury proceedings.  Indeed, the only allegation about the grand jury proceeding is a general claim that "SERRANO, HORN and/or STRADFORD falsely testified concerning their alleged interactions with Blaylock and/or O'Brien, including, but not limited to, before the Grand Jury and/or at trial."  SAC ¶ 114.

Since Jimenez's Second Amended Complaint facially lacked specific allegations of grand jury irregularity, we asked the parties to furnish the Court with the available grand jury minutes to provide greater assurance for our analysis.  In response, the parties shared with the Court the grand jury testimony of Det. Stradford, along with that of eyewitness Blaylock.[22]

The transcript of Det. Stradford's grand jury testimony fails to offer any support for the allegation that Det. Stradford falsely testified before the grand jury.  Det. Stradford's grand jury

---

[22]    Counsel from both sides represented to this Court in an email from November 13, 2024, that the grand jury minutes made available to the Court reflect "the only grand jury testimony from Det. Stradford."  Similarly, Blaylock's testimony appears complete.

testimony was entirely unremarkable, and Jimenez has not suggested otherwise since the Court requested the transcript.    Det. Stradford's testimony can be summarized as follows: at the outset, after being sworn in, he shared his general biographical information, including his rank, shield number, and experience as a cold case detective.    See G.J. Min. at 2:6–3:1.    Det. Stradford then explained his role in investigating the Worrell murder.    He stated that he was assigned the case in December of 1999, and his seven-year investigation culminated when he arrested Jimenez on August 31, 2006.    Id. at 3:1–23.    Det. Stradford also acknowledged that he met with Blaylock to conduct "an identification procedure," during which Blaylock recognized Jimenez as the one who shot and killed Worrell.    Id. at 3:24–4:15.    This is the sum total of Det. Stradford's grand jury testimony.[23]

---

[23]    As for Dets. Serrano and Horn, Jimenez's counsel urges us not to accept the Corporation Counsel's representation that neither testified before the grand jury.    See ECF No. 49 ("Pl.'s Opp.") at 15 n.2.    Apart from counsel's obligation to be candid with the Court, see ABA Code of Professional Responsibility, Rule 3.3, Candor Toward the Tribunal, there is no reason to doubt the Corporation Counsel's representation.    First, given that Det. Stradford and Blaylock testified before the grand jury, there was no need for the District Attorney's Office to have called Dets. Serrano or Horn.    Second, the Appellate Division's opinion on Jimenez's § 440.10 petition notes that Det. Serrano identified the DD-5 in connection with his interview of one of the eyewitnesses.    See Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 153, 37 N.Y.S.3d at 228.    Given that Det. Serrano testified at trial, his prior statements would have been produced to the defendant in the normal course of trial.    Thus, had Det. Serrano testified before the grand jury, Jimenez would have that testimony, which he apparently does not.    Further, there is no indication that Det. Horn testified at trial or otherwise.

Additionally, insofar as Jimenez's malicious prosecution claim is based on an allegation that the grand jury presentation did not reveal all known evidence against Jimenez, such a claim fails as a matter of established law. "[A] prosecutor is not required to present to the grand jury exculpatory evidence." Horton v. Ercole, 557 F. Supp. 2d 308, 330–31 (N.D.N.Y. 2008); see also United States v. Williams, 504 U.S. 36, 51–52 ("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body. . . . Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with th[e] [traditional] system."). Therefore, even if Jimenez could show that some exculpatory evidence was not presented before the grand jury, his claim would still fail.

To conclude, Jimenez has not rebutted the presumption of probable cause that attaches to a grand jury indictment, as there is no evidence to "warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially[.]" Rothstein, 373 F.3d at 284 (internal marks and citation omitted).

**2. Fair Trial Claim**

Jimenez also asserts a fair trial claim against Det. Stradford. As with his fair trial claims against Dets. Serrano and Horn, Jimenez brings a fabrication of evidence-based claim. First, Jimenez alleges that Det. Stradford coerced or induced Blaylock to "agree to testify against Jimenez" and should have known that Blaylock's identification of Jimenez was untrue. SAC ¶¶ 65-66, 137-39. However, there are no well-pled facts to support these serious allegations. See Iqbal, 556 U.S. at 678.

Moreover, with respect to Blaylock, Jimenez conveniently fails to highlight that Blaylock identified Jimenez as the shooter at least twelve years before Det. Stradford had any involvement in the Worrell homicide investigation. See DD-5 at R-000085. Nor does Jimenez's complaint reference that Blaylock identified Jimenez as the shooter in sworn testimony before the grand jury and at trial, where he was cross-examined. Furthermore, Jimenez overlooks the fact that Blaylock did not retract his identification of Jimenez, even during a telephone interview six years after the

trial with a private investigator hired by the Office of the Appellate Defender.[24]

Next, Jimenez suggests, without evidence or specifics, that Det. Stradford knew or should have known that Blaylock's identification of Jimenez was untrue. Such a bald allegation is totally insufficient as a matter of law. Issues of witness credibility, absent a few exceptions, are for the jury to decide. United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury.").

Finally, the absence of any factual support for the allegation that Det. Stradford knew or should have known that Blaylock and/or O'Brien's identification testimony was false segues well into the equally unsupported allegation that Det. Stradford "failed to produce to the District Attorney's Office exculpatory information that would have materially benefitted the defense, thereby

---

[24]    This telephone interview is, of course, inadmissible hearsay, and it was notably not relied upon by Jimenez in his § 440.10 motion. See supra at 12-23. During Blaylock's discussion with the defense's private investigator, he described Det. Stradford's identification procedure as a "Where's Waldo" type situation in which Jimenez's photograph appeared in multiple arrays. SAC, Ex. E at ¶ 3. However, as noted above, see supra at 33 n.18, although the OAD had the affidavit from the private investigator, whom they hired, during the pendency of Jimenez's § 440.10 motion before the New York State Supreme Court, there is no mention of it in the lengthy opinion by Justice Sackett or in the § 440.10 appeal. A reasonable conclusion is that it was either not filed or was not the focus of Jimenez's motion.

bringing about violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)."  SAC ¶ 140.  A careful review of Judge Oetken's habeas opinion establishes that there is no reference to Dets. Serrano, Horn, or Stradford as having involvement in, or responsibility for, any possible <u>Brady</u> violations.  <u>See</u> Oetken Opinion -- Habeas at *1-13; <u>see also</u> <u>supra</u> at 23-25.

In addition, Jimenez contends that his fair trial rights were denied as a result of Det. Stradford's interactions with O'Brien. Jimenez broadly claims that "O'Brien falsely inculpated Jimenez due to inducement and/or other and further suggestive and/or otherwise improper conduct by STRADFORD," SAC ¶ 75, and that Stradford "knew and/or should have known" that O'Brien had falsely implicated Jimenez, <u>id.</u> ¶ 76.  Jimenez does not offer any specific indication as to how Det. Stradford's investigative practices were suggestive or provided any inducement to O'Brien.[25]  There is no basis to conclude that Det. Stradford coerced an identification or a statement from O'Brien, nor is there a suggestion that Det. Stradford showed O'Brien fabricated evidence to compel him to

---

[25]    In fact, Justice Torres, after having heard from Det. Stradford in a hearing, made the following factual finding: "I find no evidence of any agreement of any kind other than what the parties disclosed at trial and testified to before this Court at the hearing."  Torres, J. -- Remand at *4.

implicate Jimenez.  See Sackett -- § 440.10 Opinion at *8-10.
Indeed, Jimenez's position is that O'Brien, facing a lengthy
federal sentence, needed no inducement from Det. Stradford to
testify falsely or otherwise.  Jimenez's effort to recast Det.
Stradford as a juror responsible for evaluating the truth of
O'Brien's testimony based on O'Brien's motivation to fabricate is
simply misplaced.

### 3. Failure to Intervene

The third cause of action in the Second Amended Complaint is
styled as a broad allegation that "SERRANO, HORN, and STRADFORD
failed to intervene to prevent, end, or report the unconstitutional
conduct to which Jimenez was subjected, despite the fact that they
had opportunities to do so[,] [and] [h]ad any of them come forward,
it would have prevented Jimenez from being wrongfully convicted."
SAC ¶¶ 148-49.  We have already addressed and dismissed this cause
of action with respect to Dets. Serrano and Horn.  See supra at
35-38.  Turning now to Det. Stradford, an examination of the
pleading reveals the absence of any factual allegation that would
support a failure to intervene claim against him.  Indeed, the
only references to Det. Stradford are in the recitals of the
elements of the cause of action.  See e.g., SAC ¶¶ 148, 151-53.
Clearly, those recitals, without supportive facts, are

insufficient to state a claim. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" <u>Brown v. Daikin Am. Inc.</u>, 756 F.3d 219, 225 (2d Cir. 2014) (quoting <u>Iqbal</u>, 556 U.S. at 678). Moreover, Jimenez has apparently, and appropriately, reached the same conclusion, as his answering memorandum on the pending motion only references Dets. Serrano and Horn on the failure to intervene claim.[26]

Finally, it is fundamental that there must be at least two actors to create a potential failure to intervene claim,[27] and since Det. Stradford, according to the complaint, conducted his

---

[26]    Indeed, Jimenez has -- by failing to discuss the failure to intervene claim against Det. Stradford in his opposition brief -- effectively abandoned his intervention claim against Det. Stradford.  Courts in this Circuit often dismiss "a plaintiff's claims when the plaintiff did not discuss them in his opposition to the defendant's motion to dismiss." <u>Farag v. XYZ Two Way Radio Serv., Inc.</u>, No. 22 Civ. 1795, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) (citing <u>Gross v. Rell</u>, 585 F.3d 72, 94 (2d Cir. 2009)).  Thus, where a party either only partially opposes a relevant issue or fails to engage with or defend the issue entirely, that issue is considered to "'have been abandoned.'" <u>Farag</u>, 2023 WL 2770219, at *2 (quoting <u>Jackson v. Fed. Express</u>, 766 F.3d 189, 198 (2d Cir. 2014).

[27]    <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 129 (2d Cir. 1997) ("A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal marks omitted); <u>Jackson v. City of New York</u>, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) ("An officer may be held liable [on a failure to intervene claim] for preventable harm caused by the actions of other officers.").

investigation alone, see SAC ¶¶ 64-77, there was never a basis for a failure to intervene claim against him.

## C. Jimenez's Municipal Liability Claims under § 1983 and **Monell**

Jimenez also asserts claims under § 1983 and Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), against the Bronx County District Attorney's Office and the City of New York.  Jimenez's claim against the Bronx DA is dismissed, as that office is not a suable entity.[28]  We now turn to Jimenez's Monell[29] claim against the City of New York.

A municipality may not be held liable for unconstitutional conduct under § 1983 on the basis of respondeat superior.  Monell, 436 U.S. at 693-95.  Thus, a plaintiff must establish that the municipality itself was directly at fault, Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), by linking a predicate "constitutional tort," some "purposeful or knowing conduct," or "deliberate

---

[28]    The "Eleventh Amendment prohibits individuals from suing the District Attorney's Office, an arm of the state, for damages under 42 U.S.C. § 1983 arising from prosecutorial decisions."  Quiles v. City of New York, No. 01 Civ. 10934 (LTS) (THK), 2002 WL 31886117, at *2 (S.D.N.Y. Dec. 27, 2002).  And, as the Supreme Court has held, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state."  Employees v. Missouri Public Health & Welfare Dep't, 411 U.S. 280, 280 (1973).

[29]    The elements of a Monell claim are well-established.  "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

indifference," <u>Farmer v. Brennan</u>, 511 U.S. 825, 835–41 (1994) (internal citations omitted), to a specific "action pursuant to official municipal policy," <u>Monell</u>, 436 U.S. at 691.    This analytical structure often drives courts in this Circuit to "bifurcate or stay discovery on <u>Monell</u> claims until after the plaintiff established that an individual defendant violated the plaintiff's constitutional rights." <u>Lopez v. City of New York</u>, No. 20 Civ. 2502 (LJL), 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021); <u>see e.g.</u>, <u>Ricciuti v. New York City Transit Auth.</u>, 796 F. Supp. 84, 88 (S.D.N.Y. 1992) (granting motion to bifurcate discovery in a <u>Monell</u> action).

Here, Jimenez's municipal liability claim is predicated on purported systematic <u>Brady</u> violations in the Bronx DA's Office, which, by extension, are attributed to New York City.[30] Jimenez's claim fails because the presence of a <u>Brady</u> violation, without a further showing of intent, is an insufficient "constitutional tort" for <u>Monell</u> purposes.    When bringing a § 1983 <u>Brady</u> claim, a plaintiff must not only show that police or prosecutors withheld material exculpatory evidence, but that such evidence was

---

[30]    Jimenez asserts that the underlying constitutional tort is ADA Mattaway's failure to turn over material that Judge Oetken found constituted <u>Brady</u>. <u>See</u> Oetken Opinion -- Habeas at *3-13.    To be clear, our analysis at this stage proceeds with Judge Oetken's opinion as a given.

willfully or intentionally withheld.  Bellamy v. City of New York,
914 F.3d 727, 751 n.23 (2d Cir. 2019) ("[A] civil Brady claim
requires a showing that the non-disclosure was intentional."); see
also Fappiano v. City of N.Y., 640 F. App'x 115, 118 (2d Cir. 2016)
("We have never held that anything less than an intentional Brady
violation establishes a § 1983 due process claim for damages.").
Here, the record establishes that the ADA's actions lacked the
required intentionality.  Indeed, the record is to the contrary.
See supra at 14-16, 18-22.

To begin, of the four Brady claims reviewed by the Appellate
Division, three were wholly rejected.  See supra at 18-21.  And
while the fourth (i.e., the non-disclosure regarding O'Brien's
desired sentence reduction) was deemed sufficient to warrant a
hearing before the trial court, the Appellate Division noted that
there was nothing in the record to "establish[] that the Bronx
prosecutor knew there was a quid pro quo in place for O'Brien's
testimony."  Appeal of Sackett's § 440.10 Opinion at 142 A.D.3d at
162, 37 N.Y.S.3d at 235.  Moreover, on the remanded Brady issue,
the trial judge, after a hearing, found that there was no such
Brady violation, that both ADA Mattaway and O'Brien credibly
testified that there was no quid pro quo, and that the disclosures
at trial were complete.  Torres, J. -- Remand at *3-4.

Furthermore, while Judge Oetken, contrary to the state courts, found a <u>Brady</u> violation, he never indicated that any non-disclosure attributable to ADA Mattaway was willful or malevolent. <u>See</u> Oetken Opinion -- Habeas at *3-13; <u>see</u> <u>also</u> <u>supra</u> at 23-25. And more broadly, Justice Sackett, beyond rejecting all the <u>Brady</u> arguments, found that any disclosure failures "do[] not appear to be willful," Sackett -- § 440.10 Opinion at *18, and were "inadvertent" rather than "intentional," <u>id.</u> at *24.

In sum, four justices of the Appellate Division, Justice Sackett on Jimenez's § 440.10 motion, and Justice Torres on the one remanded issue found no <u>Brady</u> violations. Judge Oetken reached the opposite conclusion. However, the issue before this Court is not which judge or judges were correct in their view of the law. Rather, a sufficient takeaway for our purposes is that reasonable jurists disagreed about whether there was a <u>Brady</u> violation, and that lack of consensus clearly demonstrates that any alleged <u>Brady</u> violation was not so glaringly intentional or flagrant as would be required to satisfy the civil <u>Brady</u> standard. Moreover, as noted, both Justices Sackett and Torres found that any non-disclosure was not willful or intentional. Jimenez's <u>Monell</u> claim thus fails and is dismissed.

**4. Common Law Negligence**

Finally, Jimenez asserts that the City is liable under a common law negligence theory for hiring and retaining the defendant detectives. While we could decline to exercise supplemental jurisdiction over this state claim, Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."), given the age of the case and the baselessness of Jimenez's claim, we address it on the merits.

Any negligent hiring theory presumes that a "predicate tort" has indeed occurred. Zeak v. United States, No. 11 Civ. 4253 (KPF), 2015 WL 246340, at *3 (S.D.N.Y. Jan. 20, 2015) ("Lacking a predicate tort, Plaintiff cannot proceed with the derivative claim of negligent hiring and retention."). Here, since we have not, after close consideration, found any constitutional violations by any individual defendant, we conclude that Jimenez lacks the basic, necessary predicate to sustain his negligent hiring claim. Accordingly, it is dismissed on the merits.

## CONCLUSION

For the foregoing reasons, the Court grants defendants'
motion and dismisses Jimenez's Second Amended Complaint in its
entirety and with prejudice. The Clerk of Court is respectfully
requested to terminate the motion pending at ECF No. 45 and close
the case.

**SO ORDERED.**

Dated:    March 27, 2025
          New York, New York

          _____
          NAOMI REICE BUCHWALD
          UNITED STATES DISTRICT JUDGE